IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | Case No. 1:07-CR-18-WLS |
| FRANK RUSSELL MCCOY | |

**DEFENDANT'S CLOSING ARGUMENT**

Mr. McCoy should be acquitted, not only because the government did not satisfy its burden of *proving* that his writings are legally obscene, but also because the Defendant *disproved* the bare allegation that his writings are legally obscene. Shortly before trial, Mr. McCoy stipulated to all elements of the charged offense, except for the notion that his writings are legally obscene. (Doc. 143). His stipulations were thereafter formally accepted by the government the day before trial, and the Parties then re-entered the stipulations jointly (Docs. 145 and 146). This left only a single issue to be proven at trial. The issue was, therefore, whether or not the government could prove, beyond a reasonable doubt, that Mr. McCoy's writings fit the legal definition of "obscenity" under the standard announced by the Court in *Miller v. California*, 413 U.S. 15 (1973).

Ironically, the government's evidentiary presentation at trial consisted exclusively of evidentiary support for *only* the elements of the offense to which Mr. McCoy had already stipulated. In the end, the government introduced absolutely no evidence (other than the stories themselves) on which this Court could base a determination of any of the prongs of the *Miller* obscenity test. The government did not introduce any evidence as to the particulars of any applicable "community" or "decency" standards, against which this Court could gauge the works' relative offensiveness, nor did

1

the government introduce **any** evidence as to what does or does not constitute "literary value", against which this Court could gauge the relative literary value of these stories. If all the cumulative evidence introduced by the government in this case were stripped away (all of which was covered by the Parties' stipulations anyway), the government's case-in-chief consists of nothing more than introducing the stories into the record, and having Agent Brant read a short fraction of a single story aloud. In light of such a bleak evidentiary record, in a criminal case nonetheless, on what basis would the government have this Court conclude that these fictional stories are lacking in "serious literary value"?[1]

Following the government's failure to meet its burden as to the only issue in dispute at trial, Mr. McCoy moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. Following which, the Court decided that the motion shall be carried with the case. Mr. McCoy's motion argued, *inter alia*, that since the government had failed to offer any evidence, let alone prove, that his writings lack serious literary value; that if it were to become incumbent on the Defendant *to disprove the notion*, that the presumption of innocence will have been cast aside in this case, and an impermissible shifting of the burden of proof in a criminal case will have been effected. Nevertheless, Mr. McCoy's case-in-chief aptly carried the shifted burden; and, in the end, the Defendant successfully *disproved*

---

[1] The government appears to maintain that literary analysis and criticism is not a learned profession – a patent absurdity. (*See* Trial Transcript at 153, wherein government counsel notes that literary analysis does not require an expert, unlike the inquiry as to "how an atom is put together"; and Government's Closing Argument, Doc. 159 at 18, where the government maintains that Professor "Richardson's opinion of the defendant's stories is entirely based upon his subjective view of how he and "people who study literature" might view the defendant's stories...[which somehow makes his opinion] irrelevant to and inconsistent with the determination the Court must make regarding how a reasonable person would assign value to these stories." Thus, the government appears to characterize "reasonable people" and "those who study literature" in mutually exclusive categories).

what the government had *failed to prove* in its case-in-chief; namely, the allegation that these writings lack serious literary value. Indeed, the government's own closing argument highlights the fact that it offered no evidence whatsoever as to the only issue at trial by noting that "it is plain that they [Mr. McCoy's writings] lack *serious* literary, artistic, political, or scientific value, in light of the material as a whole." (Doc. 159 at 13). Mr. McCoy maintains that there is nothing "plain" about it at all – if that were the case, the study of literature, and the humanities in general, would be superfluous.

During his case-in-chief, the Defendant introduced the testimony of Professor Gary Richardson. (*See* Trial Transcript, Day-1, pp. 167 - 190; and Day-2, pp. 1 - 62). Professor Richardson, a 26-year veteran Professor and Chairman of the Department of English at Mercer University, has had a distinguished career including numerous post-doctoral fellowships at prestigious institutions, a Fulbright Scholarship, membership in numerous honor societies, as well as numerous scholarly publications in peer-reviewed journals and anthologies. (Trial Transcript, Day-1, pp. 167 - 170). The Professor's substantive direct-examination testimony began by explaining the difference between "literary" and other forms of writing as, "[with regards to literary writing] we are more often than not talking about imaginative writing, which can be either narrative or lyric, [and] which is meant to be shared between an author and an audience." (*Id*. at 171). The Professor then explained some of the many ways in which "value" can be ascribed to literature as follows: (1) experimentation as to form might constitute value in a work, (2) the use of language might manifest value in a work; or, (3) the ability to draw on the human experience in a way that would be enlightening or insightful to its audience. (*Id*. at 173 – 174).

When asked whether "literary value" can be objectively, or universally, determined, the Professor answered that it can; and that notwithstanding each of our personal biases and prejudices, whether we do or do not enjoy a particular piece of literature, is quite independent from its relative literary value. (*Id*. at 176 – 177). Thus, the Professor explained that if work manifests the above-discussed literary characteristics, then it probably has a degree of value, and that degree could be measured by gauging *how well* the writer accomplishes what he wishes to accomplish. (*Id*.). The Professor was then asked to describe the methodology by which he analyzed Mr. McCoy's works. His response was that he employed an analytical technique called "close-reading", which he explained to mean that rather than merely read works for their plot, the Professor looked at the way in which Mr. McCoy's works deployed language; intertextuality (the reexamination of and reworking of older existing narratives); elements of parody and spoof; the use of folk tale traditions; the use of conventions associated with science fiction or with fantasy as a way of presenting a particular narrative; as well as the use of structural devices in the presentation of serial narratives. (*Id*. at 177 – 178). The Professor further described the "close reading" analytical technique as a careful reading of a text, looking beyond the simple plot line, with a particular regard to the use and employment of all literary devices and narrative strategies. (*Id*. at 177 – 179).

Dr. Richardson's direct-testimony went on to relate that he had in fact read all 240 stories charged (as a single count) in this case; that he had performed a "close reading" analysis of each one; and that he had arrived at an informed opinion, of which he was reasonably certain, as to the relative literary value of the body of work as a whole. (*Id*. at 179 – 180). The Professor then expressed his conclusion to the effect that this work manifested a serious literary effort, and a significant amount of literary value. (*Id*. at 180 – 181). When the Professor was then asked *why* it is his opinion that Mr.

McCoy's work manifests a serious and worthy literary effort, and is consequentially imbued with serious literary value, the Professor responded that when the 240 stories are read, along with their prologues and epilogues, the unmistakable impression is that the author is "attempting to undertake an artistic rendering". (*Id*. at 184).

The Professor was then asked to describe some literary devices, constructs, and mechanisms that are routinely employed in this body of work. In response to which, Dr. Richardson related, by way of example, that these writings employ a particular element of spoof and satirical literature, called "reader entrapment", that was most notably used by Jonathan Swift in the 18th Century (*Id*. at 184 – 186). By way of further example, the Professor testified that these writings also incorporate a technique called the "interpolated tale", which is the introduction of a separate narrative within the midst of a broader narrative in an attempt to provide background or to explain a current situation or the psychology of a particular people. (*Id*. at 187). When asked how Mr. McCoy's writings manifest intertextuality, the Professor noted that the Defendant uses anything from Abbott and Costello to Grimm's Fairytales to Victorian (literary) erotica as touchstones, and "we see a kind of dialogue going on within the work as he uses devices and mechanisms and transforms and reconfigures these devices in ways that knowledgeable readers would find interesting and satisfying as an artistic effort." (*Id*. at 187).

As to the author's use of language and his variations on the use of language, the Professor noted that Mr. McCoy is "quite good at attempting to maintain an appropriate voice and a language for particular characters…and [that] his descriptions…are quite energetic. (*Id*. at 187 – 188). Regarding variations on the narrative point-of-view, the Professor testified that "[w]hereas most

5

pornography is generally considered to reflect a male narrative, a male visual gaze…[Mr. McCoy's writings reflect] points of view [that] were all over the map…[sometimes] women and even some of the children in these stories [were employed] as the central consciousness[,] so that we are really getting the story from their point of view (*Id*. at 188). Discussing the author's choice of subject matter, the Professor testified that the child characters in many of these stories appear to have "manifest[ed] what Carl Jung would have called an "Electra Complex" in which they have transferred their emotional affection to their father[] in an attempt to, in some instances, supplant their mothers and become their father's lover." (*Id*. at 188 – 189).

By way of further explanation for the basis for his conclusion that these 240 stories, taken as a whole, do have serious literary value, the Professor explained that:

> "the variety of approaches, despite the general focus on one or two standard plots, suggests an attempt to bring to bear literary devices, mechanisms, [and] forms in such a way as to make a serious effort at speaking to the topics in a way that reflects serious thought and serious artistry…[s]o does it have serious intent? Yes, it does. Is the matter that it concerns or addresses serious? Yes, it is. And therefore, it has serious value from the perspective of those of us who study literature."

(Trial Transcript, Day-2, pp. 4 - 5).

The Professor then testified about the entirety of the story "Rapesuzy", a fragment of which was read into the record by Agent Brant; in doing so, the Professor noted that: "[i]n this case, sex is both degenerate, which [it] is not in P.D. James' work ["Children of Men"], and murderous[,] and [yet it is also] ultimately generative, which is an intriguing concept." (*Id*. at 5 - 7) (*see also id*. at 55 – 57). The Professor was then asked if disturbing subject matter can, alone, deprive a work of "serious literary value" – Dr. Richardson noted that "I have become, and most of my colleagues in literary [studies], have become wary of saying that because of a particular kind of presentation, a piece of

literarute – a work could be deemed nonliterary because of the existence of material that's troubling to any of our sensibilities or moral compasses, for that matter." (*Id*. at 7 – 8).

Next, the Professor was asked about the 18 hand-picked stories to which the government has attempted to reduce this case. The Professor testified that he was familiar with that particular sub-set, and that the selection appeared to be of primarily shorter length pieces, through which it is more difficult to gauge literary value than the longer pieces because "narrative operates primarily through character development, in our increasing awareness of the complexity of motivation and psychology within characters...[and] every time you chose a very short piece as a selection it becomes increasingly difficult to see that." (*Id*. at 8 – 9). Nonetheless, the Professor noted that even these 18 shorter pieces manifest interesting literary and artistic characteristics in that "[m]ost of them operate on an interesting principle of inversion, usually of expectations among the readers or the characters themselves…" (*Id*. at 10 - 11).

Regarding the manifestations of the mechanisms of parody and spoof, demonstrated in this body of work as a whole, the Professor testified that Mr. McCoy's writings display frequent use of "some recognizable literary form…and will parody that and will spoof the very form of that work…he also tends to pull his readers into his stories and establish certain kinds of expectations…only to invert those and thereby parody the expectations of the audience, thinking that they know what is going to happen, when, in fact, they don't."  (*Id*. at 11 - 12). The Professor further testified in this regard that this class of inversion-parody and spoof was popular in Seventeenth and Eighteenth Century English literature. (*Id*. at 12 – 13). The Professor was then asked about the different ways in which an author may deliver a narrative and how those methods were employed

by Mr. McCoy. The Professor testified that this body of work "utilizes numerous points of view", and that it "also uses numerous forms…[such as] science fiction, he [also] uses folk tales, he [also] utilizes rather traditional romance formulas with very different kinds of characters involved." (*Id*. at 16 – 17). Dr. Richardson also testified that some of these stories even employ experimental narrative strategies, such as developing a narrative entirely through dialogue (with no narrator's voice at all). (*Id*. at 17).

As to the thematic explorations undertaken by this body of work, the Professor testified that his analysis focused on "three interrelated themes and then a kind of political thematic." (*Id*. at 17 -18). Those were "the nature of love"; "the difference between love and sexuality"; the "nature of sexuality"; and "the ways in which society in some senses helps us construct and indeed occasionally coerces us to relate sexually to the rest of the world and those around us." (*Id*. at 18). The Professor also noted that there is a pervasive political theme to Mr. Mcoy's body of work, noting that "I would make the observation that there's a political theme here that our culture has become increasingly more repressive in terms of sexual mores over the last at least 40 years, and Mr. McCoy's stories seem to insist that that conversation needs to be reopened with some degree of seriousness, and these stories seem to be a way to insist upon that." (*Id*. at 18). At which point, the Professor's direct-examination testimony ended with him reiterating his conclusion that this body of work, all 240 stories, taken as a whole – and viewed with regards to narrative strategies and narrative devices employed, various thematic explorations, and the use of language – "**does have serious literary value**." (*Id*. at 18 - 19) (emphasis supplied).

The Professor's cross-examination testimony reiterated his conclusion that "people who study literature would find his [Mr. McCoy's] stories to have serious literary value." (*Id*. at 25). Also on cross-examination, when government counsel tried to distinguish between performing a "close reading" of a work, and analyzing a work "as a whole" – the Professor dispelled any notion of inconsistency between the two terms by noting that close reading "is a technique of reading stories that can be deployed in the totality of a work." (*Id*. at 43 – 44). Still on cross-examination, government counsel asked the Professor to name a similar piece of literature that does not have serious literary value; to which the Professor responded that this kind of material is not part of his recreational reading or within the purview of his normal teaching – however, if he were to go to an adult bookstore, he could surely find a similar work that would not be imbued with serious literary value. (*Id*. at 51 – 51). The Professor, when pressed further on naming something similar but without "serious literary value", noted that there are certain passages in the Marquis de Sade's work that do not have serious literary value – however, Dr. Richardson again reiterated his finding that all of Mr. McCoy's works at the heart of this case do have serious literary value. (*Id*. at 52 – 53). Lastly, on re-direct examination, the Professor confirmed that he had applied the "close reading" analytical technique to the entirety of each and every one of the 240 stories at the heart of this case. (*Id*. at 59).

Therefore, Mr. McCoy's case-in-chief thoroughly *disproved* the government's *unproven* allegation that his writings lack serious literary value. Neither did the government offer any evidence (either in its case-in-chief, or as rebuttal evidence) that in any way detracts from the substance of Dr. Richardson's testimony; nor did the government's cross-examination undercut any of the Professor's direct-examination testimony. Nevertheless, the government's closing argument advances a number of surprising assertions that invite the Defendant's response.

9

The government's closing argument relates that "[n]othing in the defendant's description[s] of his work or its genesis suggest[s] that he intended the stories to be perceived as having *serious* literary, artistic, political or scientific value." (Government's Closing Argument, Doc. 159 at 14) (emphasis in original). This statement was made by the government in an attempt to justify its statement that Professor Richardson's opinions are "either not relevant or simply not credible". (*Id*. at 13 - 14). Obviously, it is not a necessary element of "literary value" that an author's prologues or epilogues "suggest" that he "intended" the fiction to be perceived as having literary value. The value of a work is independent of any "intent" that may be "suggested" by something that is, or isn't, part of a prologue.

The government, while resting on the naked and unfounded assertion that "it is **plain** that they [Mr. McCoy's writings] lack serious literary...value, in light of the material as a whole" (*id*. at 13), complains that:

> "[Professor] Richardson's testimony regarding literary quality and societal acceptance and relative political and literary value of the defendant's stories further lacks relevance to the ultimate determination this Court must make because it is predicated on his points of reference to Marxist literature in the 1930s, feminist literature in the 1970s, African-American literature 50 years ago, and the distant "prosecutions" of Henry Miller, James Joyce, and DH Lawrence . . . This historical literature is not only too remote in time to be relevant in this trial (with respect to the first two prongs of the obscenity test), it is so different in kind that it lacks a credible basis for comparison drawing or ascribing political or literary value to the defendant's stories."

(*Id*. at 17) (emphases supplied).

This particular statement by the government not only defies logic, but constitutes a serious misrepresentation of the record.[2] Professor Richardson's opinion as to *why* Mr. McCoy's stories manifest serious literary value (described in ample detail *supra*) <u>was not</u> predicated on points of reference to literature that "is so different in kind that it lacks a credible basis for comparison drawing." During that portion of the Professor's direct-examination testimony, the following exchange took place:

> DEFENSE COUNSEL: I see. Professor, to shift topics here for a moment, what are the various methods [] professional[s] such as yourself use to analyze literature?
>
> PROFESSOR RICHARDSON: Well, of course, like lawyers have become conversant with the rules and methodologies of analyzing a statute, for example, those of us who spend our lives reading literature become conversant with the deployment of certain literary characteristics within pieces of literature. We, therefore, recognize them when we see them. We spend a great deal of time thinking about ways in which literature might be valued. I said, a few moments ago, politics. Politics is a very broad topic and comes from, you know, a great number of perspectives. For example, a classic Marxist in the '30s would look at representation of the struggles of the working class as being valuable, having persuasive cultural value. A feminist in the '70s would look at a work, even a classic work, that made vivid for its audience the nature, the difference of women's experience from male experience. The very existence of the African-American Canon today reflects a steady work for the past 50 years by people who have suggested that literature written by African-Americans provides access to an element of American experience that is otherwise unavailable and, sadly to say, was for many years was not accepted as literature. Of course, there's certain activities that the classic instances of Henry Miller and James Joyce and DH Lawrence, all of whom were at one point prosecuted for obscenity, suggest that -- particularly in those three instances -- that sexual material may be in some senses too cutting edge for the contemporary audience, but

---

[2]This is not the only incorrect characterization of the record effected by the government in this case. The government, since the outset of this case, in almost every pleading, and repeatedly throughout the trial of this case (*see e.g.*, Trial Transcript, Day-1, pp. 32, 36, 46) refers to the plot-lines of Mr. McCoy's fictional writings as involving, *inter alia*, murders of children. This, more than anything, proves that neither government counsel, nor its agents, have ever actually read through this body of work. Mr. McCoy maintains that murder is not an element in any of his plot-lines, and when the Court conducts its own review of this body of work that will be borne out.

11

> will subsequently be recognized as extremely valuable as long as the literary quality is sufficient to make that experience available to the audience.
>
> (Trial Transcript, Day-1, at pp. 175 - 176).

Thus, the Professor was only being asked what are some of the various *methods* for analyzing literature, which he explained as an evolving discipline. The Professor was noting the fact that those who study literature become "conversant with the deployment of certain literary characteristics". Further, the Professor offered a number of examples such as the suggestions that "literature written by African-Americans [is now viewed to] provide[] access to an element of [the] American experience that...sadly to say, was for many years was not accepted as literature".

The government also maintains that "[Professor] Richardson made several statements on cross examination that belie the credibility of his opinion regarding the seriousness of the defendant's use of literary devices in his stories." (Doc. 159 at 18). In support of this assertion, the government notes that the Professor "testified that he would not list the act of testifying in this case as part of his professional credentials, even though it is common for expert witnesses to note trial experience on their resumes." (*Id*.). This assertion is problematic on several grounds: (1) the Professor is a 26-year veteran professor and noted scholar of English and American literature, and compared with the rest of his curriculum vita, the act of testifying in a criminal case (uncommon for English professors) is manifestly insignificant, and therefore has absolutely no bearing on the credibility of his opinion; (2) the government's bare assertion that "it is common for expert trial witnesses to note trial experience on their resumes" neither establishes that "commonality" as a fact, nor connects it to the credibility of the Professor's opinions. By way of further "support" for the government's attack on the credibility of the Professor's opinion, the government notes that the

Professor "testified that he has no knowledge whether the defendant's stories have been published or sold in a reputable book store..." (*Id*. at 19). The Professor's knowledge, or lack thereof, about the circulation of these stories in bookstores (reputable or otherwise) has absolutely no bearing on the credibility of his professional opinion as to the relative literary merit of those works. The government also raised the notion Mr. McCoy's work had not been "peer-reviewed". (*Id*.). This assertion is also problematic on a number of grounds: (1) whether or not Mr. McCoy's stories had been the subject of "peer-review" has no bearing on the credibility of Dr. Richardson's professional opinion as to their relative literary value; (2) "peer-review" is a mechanism by which scientific findings and other scholarly (non-fiction) writing is subjected to scrutiny by a particular segment of the scholastic community; (3) the government should be reminded that it **arrested and indicted** Mr. McCoy for allowing others to read his stories, in light of which it seems disingenuous to complain about the work not having been subjected to *enough* peer-review.

Having satisfied itself with its attacks on the "credibility" of the Professor's opinion, the government's closing argument returns to its foundational position, proclaiming that the Professor's opinion "is not necessary for the Court to determine whether the defendant's stories have serious literary...value" (*Id*. at 19). What the government failed to do in this case was to provide the Court with **any** basis on which a determination as to lack of serious literary value might be based. It is, therefore, the prosecutor's <u>opinion</u> that these stories are *obviously* without literary value, which in a manner asks for a conviction based on nothing more than government counsel's opinion.

But on an occasion of this serious and dangerous complexion, when an American citizen is brought before a court of justice for having ventured to do nothing more than to narrate some

13

fictional tales of his own invention, Mr. McCoy prays that more would be required by way of proof of lack of literary value than the unfounded expression of the prosecutor's opinion. Mr. McCoy therefore asks that this Court not suffer so dreadful an example to go abroad into the world as the ruin of an upright man founded on nothing more than the prosecutor's uninformed opinion to the effect that "it is plain that they [Mr. McCoy's writings] lack serious literary...value" (Doc. 150 at 13).

Dated: This 3rd day of February, 2010.

Respectfully submitted,

Cynthia W. Roseberry – Executive Director
Federal Defender Program – Middle District of Georgia

By:
/s/ Morad Fakhimi
MORAD FAKHIMI
PA Bar ID. 204228 — DC Bar ID. 974050
Federal Defender Program – Middle District of Georgia
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747 — Fax: (478) 207-3419
Morad_fakhimi@fd.org

**CERTIFICATE OF SERVICE**

I, Morad Fakhimi, hereby certify that on February 3, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such to all counsel of record.

/s/ Morad Fakhimi
MORAD FAKHIMI
FEDERAL DEFENDERS OF THE
MIDDLE DISTRICT OF GEORGIA, INC.
440 Martin Luther King, Jr. Blvd.
Suite 400
Post Office Box 996
Macon, Georgia 31202-0996
Phone: (478) 743-4747
Fax: (478) 207-3419
morad_fakhimi@fd.org
PA Bar ID. 204228
DC Bar ID. 974050