```
 1                         CAUTION:

 2           THE CONTENTS OF THIS TRANSCRIPT

 3            CONTAIN SUBJECT MATTER THAT

 4                 MAY BE OFFENSIVE.
                        ---
 5

 6
      THIS TRANSCRIPT HAS BEEN REDACTED PURSUANT TO
 7       COURT ORDER DATED JANUARY 22,  2010

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    United STATES DISTRICT COURT
                      MIDDLE DISTRICT OF GEORGIA
 2                        ALBANY DIVISION

 3                CASE NO. 1:07-CR-18 (WLS-RLH)

 4

 5

 6   UNITED STATES OF AMERICA

 7        Plaintiff,

 8   Vs.

 9   FRANK RUSSELL MCCOY

10        Defendant.

11

12                         BENCH TRIAL

13          BEFORE THE HONORABLE W. LOUIS SANDS
               UNITED STATES DISTRICT COURT JUDGE
14

15

16   DATE:                    JANUARY 13, 2010

17   LOCATION:                ALBANY, GEORGIA

18   COURT REPORTER:          R. DARLENE PINO

19

20   APPEARANCES:

21        FOR THE PLAINTIFF:    JAMES N. CRANE
                                CHANTEL L. FEBUS
22

23   FOR THE DEFENDANT:         CYNTHIA W. ROSEBERRY
                                MORAD FAKHIMI
24

25
```

```
 1                    I N D E X

 2                    WITNESSES

 3    For Defense:                              Page

 4    Gary Richardson
        Direct Examination by Mr. Fakhimi        4:9
 5      Cross-Examination by Ms. Febus          19:9
        Redirect Examination by Mr. Fakhimi     53:18
 6      Recross-Examination by Ms. Febus        61:10
        Further Redirect by Mr. Fakhimi         62:3
 7


 8
      DEFENDANT'S ADVICE OF RIGHTS             65:19
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           THE COURT:  Good morning.

2           COUNSEL COLLECTIVELY:  Good morning.

3           THE COURT:  All right.  I believe we were in

4    direct examination of a witness.  If the witness will

5    return to the stand.

6        All right.  You may continue, Mr. Fakhimi.

7           MR. FAKHIMI:  Thank you, Judge.

8              **GARY RICHARDSON, DEFENSE WITNESS**

9               **DIRECT EXAMINATION, CONTINUED**

10   **BY MR. FAKHIMI:**

11   Q    Professor, yesterday we left off with a discussion

12   that immediately followed your statement of your

13   conclusion that this body of work as a whole has literary

14   value and that the literary effort employed by the author

15   is serious.  Can you repeat for us why you reached this

16   conclusion?

17   A    Well, the totality of the work, the entire 240

18   stories, suggested to me that the variety of approaches,

19   despite the general focus on one or two standard plots,

20   suggests an attempt to bring to bear literary devices,

21   mechanisms, forms in such a way as to make a serious

22   effort at speaking to the topics in a way that reflects

23   serious thought and serious artistry.

24        I guess I would have to note that for something to be

25   constituted as literature, it does not necessarily have to

1   be on equivalent with Shakespeare or Dickens or anyone

2   else.  If that were the case, Barnes and Noble would have

3   to essentially sweep its shelves and take most of what we

4   think of as contemporary literature off its shelves.

5        So does it have serious intent?  Yes, it does.  Is

6   the matter that it concerns or addresses serious?  Yes, it

7   is.  And therefore, it has serious value from the

8   perspective of those of us who study literature.

9   Q    Okay.  Now do you recall reading and analyzing

10  specifically the story "********"?

11  A    Yes.

12  Q    I believe the full title is a bit longer.  Raping

13  Little Suzy or something of the sort.

14        If one were to look at an isolated passage from that

15  story and strip it from the rest of the content of the

16  story, a single paragraph, maybe two, is it possible to

17  glean literary value just by looking at that passage?

18  A    Probably --

19  Q    I'm sorry.  Let me rephrase the questions.

20  A    Sure.

21  Q    Is it possible to condemn the entire story by reading

22  a single passage?

23  A    Yes.

24  Q    So by reading a single passage, you can say that an

25  entire story does not have value?

1    A    No.  What you can say is that the passage has no

2    value.

3    Q    I see.  So to determine the value of a complete

4    story, you would essentially need to read the entire

5    story?

6    A    Yes.

7    Q    What are your impressions of that story as to

8    literary value?

9    A    It is a story that on its face is extremely

10   disturbing.  I found much of what Mr. McCoy wrote

11   personally disturbing.  It did not interfere with my

12   assessment.

13        The story, itself, is predicated upon an inversion of

14   a biological reality.  That reality is that all of us come

15   into existence through the sexual act.  This act -- This

16   particular story explores whether or not, on the one hand,

17   sex might be used in a violent way, and indeed it is used

18   in a violent way, a chemically induced kind of

19   hyperviolence.  On the other hand, ultimately, it is only

20   through that sexual act that Suzy and her father are

21   saved.

22        Obviously this is a kind of fantasy, but it does not

23   necessarily therefore mean that it is -- it does not

24   contain serious literary value.  I mean, I deal with

25   literature all the time that is violent in the extreme.

1    In King Lear, Gloucester has his eyes gouged out on stage

2    for the audience to see.

3        If violence is to be used as the means of saying

4    something does not have literary value, we've got to get

5    rid of most or much of literature any way.

6    Q    Absolutely.  Now, you mentioned chemically induced

7    violence.  Is this particular story a work of science

8    fiction?

9    A    It would be -- Yes, to my mind, it sort of hinges

10   more toward the science fiction field than the fantasy

11   field.

12       The use of nanobots suggests a kind of fantastic

13   world.  This, in some senses, is a version of

14   postapocalyptic fiction that has been very popular in the

15   20th Century.  PD James, whose best known as a detective

16   novelist but a very serious novelist, wrote a book called

17   "Children Of Men", which many people have seen an

18   adaptation of, which in some senses takes the sort of

19   opposite view which is that the problem is sterility, that

20   the human race is dying out because of sterility.

21       In this case, sex is both generative, which it is not

22   in PD James' work, and murderous and ultimately

23   generative, which is an intriguing concept.

24   Q    Now, Professor, you mentioned something earlier I

25   want to explore a bit, that, in your view, Mr. McCoy's

 1    subject matter in some or all of these stories is

 2    disturbing.  Does disturbing subject matter in any way

 3    affect literary value?  In other words, if something is

 4    disturbing, would that, per se, detract from literary

 5    value that may manifest itself through use of narrative

 6    devices, point of view, so on and so forth?

 7    A    If I looked at the broad and long history of

 8    literature, I would have to conclude that initially it may

 9    well.  My colleagues in the French department might well

10    choose to teach the Marquis de Sade.  The very nature of

11    his work wound him up in an insane asylum because the

12    subject matter of the work was sufficiently disturbing to

13    the contemporary audience.

14         And therefore, I have become, and most of my

15    colleagues in literary, have become wary of saying that

16    because of a particular kind of presentation, a piece of

17    literature -- a work could be deemed nonliterary because

18    of the existence of material that's troubling to any of

19    our sensibilities or moral compasses, for that matter.

20    Q    Yet, Marquis de Sade's work is now presently viewed

21    as being imbued with all manner of literary value.  Is

22    that correct?

23    A    Correct.

24    Q    All right.  Professor, I'm going to read you the name

25    of 18 individual stories out of this body of work.  I

1      would like to ask you a question about the 18.  But first,

2      if you could verify that you have, in fact, read these 18

3      along with the rest.  You have already verified that you

4      read everything.

5          But these 18 particularly, the file names would be

6      **** ******* ****** ***** ****** ******** **** * *** **

7      ***** ******** ****** ****** ********* ******** *******

8      ***** ********** **** ******* *********** ******** ***

9      ********* *** *** ****** ******** ********* *** **********

10     *********** ******* ******* ******** ** **********

11     ********* *** ****** ******

12         Are you familiar with these 18, Professor?

13     A    Yes.

14     Q    If you were to discuss the relative literary value of

15     these 18 in comparison with the literary value of the

16     larger body of work that you reviewed, the 240 stories,

17     how would you say that that would compare?

18     A    The large number of very short pieces in that

19     particular list makes it difficult for people to evaluate

20     the literary quality of the material.

21         Narrative operates primarily through character

22     development, in our increasing awareness of the complexity

23     of motivation and psychology within characters.  So every

24     time you choose a very short piece as a selection, it

25     becomes increasingly difficult to see that.

1        Let me, as a point of comparison, I'm teaching a

2    course in German fiction in this particular semester.  The

3    anthology that I have has only one story in it out of 70

4    that is under five pages printed in this anthology.

5        So if you look at the short quality of the short

6    length of some of these stories, it would be difficult to

7    see that.  The longer ones tend to validate, more

8    obviously, my observation about the literary -- the

9    specifically literary as opposed to political seriousness

10   of the works.

11       The shorter pieces I would tend to move toward the

12   political end of the spectrum that I talked about

13   yesterday, which has a value in and of itself, but it is

14   not necessarily an aesthetic value.  But it does not

15   detract because it is within the political realm from the

16   seriousness of the literary value.

17   Q    Professor, to the best of your memory, I know the

18   review you conducted in this case of the materials was

19   voluminous, but from what you remember about these 18

20   particular stories, what observations can you draw as to

21   the literary value and the literary effort of these 18 in

22   particular, as short as they may be?

23   A    Most of them operate on an interesting principle of

24   inversion, usually of expectations among the readers or

25   the characters themselves.  One of the stories, for

1    example, hinges upon the concept of a father instructing

2    his child in the facts of life.  Most of us, most readers,

3    would expect this to generate a kind of conversation where

4    do -- how are babies made, where do they come from, what

5    is the biology.  The father in this story, of course, has

6    intercourse with his daughter as a kind of model of

7    education in which, ironically enough, it hinges on

8    demonstration.

9         This is not particularly a story that is long.  In

10   fact, it is relatively short.  But it does show a kind of

11   use of inversion, which is a technique that oftentimes we

12   associate with literature, and expectations.

13        There's also in the same story, a conflict at the

14   linguistic level between the husband and wife.  The wife

15   insists that the husband make sure to instruct the

16   daughter.  The daughter has an entirely different

17   viewpoint about what she wishes to talk about or have

18   happen to her.  And the father complies with the

19   daughter's wishes as opposed to the mother's wishes, and

20   therefore, there's an inversion of the mother's

21   expectations within the same story.

22        And part of the humor of the story is the sort of

23   complicit or the complicity of the daughter and father in

24   creating a kind of little conspiracy against the mother.

25   Q    So, okay.  Professor, again to focus your attention

1   back on the large body of work as a whole, all of the

2   stories that you reviewed --

3   A    Right.

4   Q    -- can you discuss for us instances of the use of

5   parody or spoof that you made observations about?

6   A    Yes.  Oftentimes in Mr. McCoy's work, he will use

7   some recognizable literary form.  As I mentioned

8   yesterday, things like folk tales, for example, Goldilocks

9   or the Big Bad Wolf, and will parody that and will spoof

10  the very form of that work.

11       He also tends to pull his readers into his stories

12  and establish certain kinds of expectations as in the

13  story that I was just mentioning a moment ago, only to

14  invert those and thereby parody the expectations of the

15  audience, thinking that they know what is going to happen

16  when, in fact, they don't.

17  Q    Would you say that parody and spoof are pervasive

18  through this body of work or that they appear sporadically

19  here and there?

20  A    I would say that they tend to -- formal parodies tend

21  to appear relatively infrequently.  They are there and in

22  the totality of the work it becomes more obvious; however,

23  it is not necessarily pervasive in that sense.

24  Q    Where would you see this sort of tactic in other

25  recognized literature?

1    A    Well, in an area that I'm most familiar with, the

2    18th Century, what we often have is things called mock

3    epics in which the conventions of epics are inverted.

4         In a poem like "Mac Flecknoe" by John Dryden, the

5    17th Century poet.  He actually uses the conventions of

6    the death of the hero and inverts those by having the

7    hero, who is dying, not a great warrior, but a hack poet,

8    whose succession is not to be biological but is to be

9    based upon the inferior poetic ability of another poet who

10   will succeed his crown as the worst poet in London.

11        Alexander Pope, in the same period, made a career, in

12   some senses, of not only translating things like the

13   "Aeneid", but also, you know, poem like the "Rape of The

14   Lock" -- excuse me -- a poem like the "Rape of The Lock",

15   inverting those conversions to parody, social mores of his

16   contemporaries.

17        In that particular case, he gives all the trappings

18   of an epic poem to an incident between two Catholic

19   families in which a young woman's curl has been cut off,

20   and the families are at odds.

21        And this continues.  In some senses -- I mean

22   arguments are made that Huckleberry Finn, by Mark Twain,

23   is in some senses a parody of the boy conduct books that

24   are exemplified in something like Tom Sawyer.  So this is

25   a pervasive technique, and it can be turned overtly to

1    politics.  Aristophanes comedies, "The Birds" and "The

2    Wasps" are parodies of comedic conventions in Greek

3    theatre brought to bear politically on Athenian politics.

4         Would you care for more?

5    Q    I would rather actually ask you, we were just

6    discussing inversion of expectations of the reader.

7    A    Right.

8    Q    Yesterday we had talked about reader entrapment.

9    A    Right.

10   Q    These two separate devices.  Could you explain the

11   difference between these concepts?

12   A    Reader entrapment takes inversion, which is a

13   narrative technique, to a new level in which it actually

14   precipitates, as I talked about, for example in the Swift

15   illustrations yesterday, takes it to a new level in which

16   the reader, him or herself, is brought into the tale; but

17   usually there's a more serious -- rather than merely an

18   inversion of expectations, there's a more serious project

19   here.

20        And to be frank, my suspicion, given some of the

21   prefaces and prologues and epilogues in Mr. McCoy's work,

22   is that this very event has in some senses proven the

23   nature of the entrapment that he has set for the legal

24   authorities.

25   Q    I'm sorry, Professor.  This is something you can

```
 1    glean from the literature itself?  From the prologues
 2    themselves?
 3    A    Yes.  He has a very strong --
 4              THE COURT:  Yes.
 5              MS. FEBUS:  Objection.  He's testifying to an
 6    issue of legal entrapment.  It's not an issue in this
 7    case.  He just mentioned something about the defendant
 8    setting a trap for legal authorities to come and, what,
 9    arrest him?  I don't understand.
10              THE COURT:  How do you entrap legal authorities?
11    That's not -- that's not entrapment.  If that's what you
12    are asking for, she's dead right, but I didn't think
13    that's what you were talking about.
14              MR. FAKHIMI:  Your Honor, we're not talking
15    about entrapment in the legal defense sense of the word.
16    We're talking about it as a literary technique where the
17    author entraps his reader.
18              MS. FEBUS:  Okay.  I understand that, but the
19    expert, Mr. Richardson, was just testifying to police,
20    authority being called in, and that part being the
21    defendant's intent.  That's not his testimony that I have
22    an objection, but that was a statement that he just made.
23              THE COURT:  Well, I understand that may be the
24    statement as made, but I don't think the statement he made
25    was in the form of entrapment that meets the objection you
```

1    are making.

2              MR. FAKHIMI:  Your Honor, just to avoid any

3    issue at all, I will withdraw the question and the answer

4    can be disregarded if that would help the government --

5              THE COURT:  All right.  That solves that, that's

6    fine with me.

7         All right.  You may ask another question.

8    BY MR. FAKHIMI, CONTINUED:

9    Q    Professor, let's talk narrative strategies.  There

10   are different ways to develop a narrative and tell a

11   story.  How many -- Please give some examples of the

12   different modes and models that this author uses to

13   deliver his narratives across the body of this work from

14   one story to another?  How many different ways, as far as

15   your memory recalls, does this man know how to tell

16   stories?

17   A    Well, that question is complicated or has as a kind

18   of subdivision of it the whole idea of the influence of

19   point of view on telling a story.  So, for example, the

20   same set of events told from multiple points of view can

21   result in as many narratives as one might wish.  Over the

22   body of Mr. McCoy's work, much of which deals with sexual

23   escapades, he utilizes numerous points of view.

24        He also uses numerous forms.  As I mentioned before,

25   he can utilize science fiction, he utilizes folk tales, he

1    utilizes rather traditional romance formulas with very

2    different kinds of characters involved.

3        I am not sure if I'm actually addressing your

4    question in a way that you --

5    Q    You did.  You did.

6        Let me ask you, has he done anything unconventional

7    in any of these stories, say, for example, to deliver a

8    narrative strictly through dialogue without having a

9    narrator's voice at all?

10   A    Yes.  I mean one of the points of view, and this is

11   the reason I raise that issue, was that when Ernest

12   Hemingway burst on the literary scene, one of the

13   techniques that was most often associated with his work

14   was the so-called dramatic point of view.  There is no

15   narrator.  It is in some senses merely a dialogue between

16   one -- between at least two and sometimes more people.

17       And at least in two instances in the 18 stories that

18   were provided, Mr. McCoy deploys this technique as a way

19   of telling his tale.

20       So, indeed, he does deploy that narrative technique.

21   Q    Professor, we'll wrap things up here by speaking

22   thematically about his works.  What themes are explored in

23   the body of this work as a whole?  What overarching themes

24   do you see?

25   A    Well, as I mentioned yesterday, I would probably

1    focus on three interrelated themes and then a kind of

2    political thematic.

3         The one is the nature of love, a persistent theme in

4    literature.  The difference between love and sexuality,

5    and the -- not only the nature of sexuality, how we are

6    disposed to interact sexually with the rest of the world,

7    but the very nature of that, what's the relationship

8    between love and sexuality.

9         In addition, the ways in which society in some senses

10   helps us construct and indeed occasionally coerces us to

11   relate sexually to the rest of the world and those around

12   us.

13        In addition to that, I would make the observation

14   that there's a political theme here that our culture has

15   become increasingly more repressive in terms of sexual

16   mores over the last at least 40 years, and Mr. McCoy's

17   stories seem to insist that that conversation needs to be

18   reopened with some degree of seriousness, and these

19   stories seem to be a way to insist upon that.

20   Q    So, Professor, I'll just end with asking you, with

21   regards to this entire body of work, with regards to

22   narrative strategies and narrative devices, thematic

23   exploration, the use of language, what is your conclusion

24   as to the relative literary value or worth of this body of

25   work?

1    A    Under the narrow definition of literary value, it

2    does have serious literary value.

3    Q    Thank you, Professor.

4         MR. FAKHIMI:  I have no further questions,

5    Judge.

6         THE COURT:  All right.  Cross examination?

7                    **CROSS-EXAMINATION**

8    **BY MS. FEBUS:**

9    Q    Good morning, Mr. Richardson.

10   A    Good morning.

11   Q    Are you being paid for your testimony today?

12   A    Yes.

13   Q    What are you being paid?

14        MR. FAKHIMI:  Objection, Your Honor, relevance.

15        THE COURT:  Well, I think it's a credibility

16   issue.  It always is, isn't it?

17        MR. FAKHIMI:  All right.

18        MS. FEBUS:  Thank you.

19   A    Yes.  I am paid my usual fee, which is $200 an hour.

20   Q    So how many hours have you worked in preparation for

21   this case?

22   A    Something on the order of probably 135.

23   Q    135 hours to prepare for the case?

24   A    Yes.

25   Q    Okay.

1   A    I read through --

2   Q    And are you -- I'm sorry.

3   A    No, I was just saying you don't read 3,000 pages of,

4   manuscript --

5   Q    I understand.

6   A    -- in rapid periods of time.

7   Q    Understandable.  But you've spent 135 hours preparing

8   for the case at $200 an hour.  Is that correct?

9   A    Yes.

10  Q    Are you being paid for the time you spend testifying?

11  A    Yes.

12  Q    Is that the same rate?

13  A    Uh, as I remember, it is $300 an hour, which is the

14  standard rate for expert testimony, as I understand it.

15  Q    How about the time that you spent yesterday in the

16  courtroom listening to other testimony, were you paid for

17  that time?

18  A    To be frank, I am not a very good businessman, so I

19  am not sure.

20  Q    But you may have been paid for that time, you are not

21  sure?

22  A    I may, I don't know.

23  Q    Have you testified in trials before?

24  A    No.

25  Q    Have you -- so you haven't testified in obscenity

1    trial?

2    A    No.

3    Q    In this case, would it be normal in your profession

4    as an academic to testify in trials and then to add that

5    to your resume?

6    A    I can't really see -- No, I mean I -- No.  It has no

7    value to me as a professor of literature.

8    Q    So your testimony in this trial, which is largely

9    about obscenity, has no value to you academically, I mean

10   it is not something you would put on a resume or note

11   somewhere?

12   A    No, I can't -- No.  The kinds of jobs that I would

13   apply for as a professor don't usually focus on whether or

14   not I have expertise in criminal prosecutions.

15   Q    But in your resume you've put down other things, when

16   you've taught, when you've given trainings, when you've

17   written books, when you've done any -- Are you here in a

18   professional capacity as an expert?

19   A    Yes.

20   Q    Okay.  On your resume you list other professional

21   capacities.  Your resume is very extensive.  All the other

22   professional capacities in which you've acted over the

23   course of the past 20 years or so, and this is something

24   you would not put on your resume, is so dissimilar from

25   that.

1    A    That would be my first inclination.  I can't -- I

2    mean --

3    Q    Okay.  You mentioned a moment ago references to

4    Barnes and Noble, and that the defendant's work doesn't

5    have to compare to Shakespeare in order to be considered

6    serious.  Is that correct?

7    A    Yes.

8    Q    When you were making that reference, I took your

9    point to be that there are other books in Barnes and Noble

10   that don't stand up to Shakespeare, but Barnes and Noble

11   doesn't, you know, kick those out or not publish them or

12   not carry them?

13   A    Uh-huh (Affirmative Response).

14   Q    To the best of your knowledge, are any of the

15   defendant's stories in Barnes and Noble?

16   A    No, to the best of my knowledge.

17   Q    After reviewing the defendant's stories, you also

18   just testified that -- I'm sorry -- you testified that

19   after reviewing the defendant's stories, you concluded

20   from a serious perspective of those who study literature

21   that his stories have serious literary value.  Is that

22   correct?

23   A    The more accurate rendering of that would be that

24   from the standards of people who study literature, his

25   stories would manifest serious literary value, yes.

1    Q    So you refer to people who study literature?

2    A    Yes.

3    Q    Are you aware that the Court, sitting as a fact

4    finder, has to look to whether a reasonable person would

5    consider his stories -- to have serious literary value and

6    not what a group of professors would consider to be

7    literary value?

8              MR. FAKHIMI:  Judge, I object.  I don't think

9    the witness would be able to even answer that.

10             THE COURT:  What do you mean?  What do you mean

11   would not be able to answer that?

12             MR. FAKHIMI:  The government attorney is asking

13   the witness whether or not something is the province of

14   the Court for the witness.

15             THE COURT:  Well, I think he's testifying as an

16   expert, so I think that's appropriate cross examination as

17   to the witness' ability to -- or expertise in the area of

18   which he's been called to testify as an expert.

19             MR. FAKHIMI:  But that wasn't the question, Your

20   Honor.  She was asking the witness whether or not

21   something was the province of the Court as a fact finder.

22   The witness here testified as an expert on literary value,

23   but does not know necessarily where the province of the

24   Court begins and ends, where the province of a jury begins

25   and ends.  I believe counsel is editorializing.

1            THE COURT:  Well, I think if your objection is

2      that the question is outside his area of expertise --

3            MR. FAKHIMI:  And outside the scope of his

4      direct testimony and it does not go to bias or anything.

5      I can't -- I can't understand how he would be able to

6      answer the question.  It calls for a legal conclusion.

7            THE COURT:  Well, the question asked -- I don't

8      think the question would be improper to the appropriate

9      expert because, generally speaking, experts are testifying

10     about standards and whether things meet -- you know, like

11     in a doctor's case whether something meets the medical

12     standard.

13          But the question here, I think, is whether he's

14     testified in that capacity on that sort of issue.  So in

15     that degree, I will sustain your objection, but the

16     general statement that an expert can't comment on the law

17     I think is incorrect.  But I don't think this witness has

18     testified about that, and as I understand it, has not been

19     presented to the Court as an expert in that regard.  I

20     think he's presented simply as an expert on what is

21     literature -- literary value.

22          In that sense, I think your objection is correct --

23     is valid, and I sustain it for that purpose.

24            MR. FAKHIMI:  Thank you.

25     BY MS. FEBUS, CONTINUED:

1    Q    I'll just reask the question based on the testimony

2    that you gave.  Did you testify several minutes ago that

3    from the perspective of people who study literature, the

4    defendant's stories would not be considered obscene or

5    that they would be considered to have literary value?

6    A    Again, we are working with my somewhat limited

7    understanding of the legal implications of the word

8    obscenity.

9    Q    I'm just asking you about what you testified to not

10   five minutes ago.

11   A    What I testified to was that people who study

12   literature would find his stories to have serious literary

13   value.

14   Q    Okay.  You also testified about a story called

15   "********", which is in evidence.  I believe that you

16   testified that you thought that that story had literary

17   value because it was predicated upon an inversion of

18   biological reality, of coming into being through sexual

19   acts.  Is that correct?

20   A    To as far as you have gone, yes.

21   Q    And then you further made a statement or concluded

22   that the story -- that through the story, Suzy and her

23   father -- and again I'm quoting you -- were saved through

24   the acts that they engaged in?

25   A    Yes, they were biologically saved.  Yes.

1    Q    They were biologically saved.  Okay.  I want to make

2    sure that we are all talking about the same story.  So

3    "********" involves a father raping a girl with a large

4    engorged penis to the point where his penis goes through

5    her diaphragm, through her lungs, rips her apart.  He then

6    ejaculates into what is left of her lungs and strangles

7    hers.  Okay.  How does this evidence a saving of Suzy and

8    her father through that text?

9    A    Because the seizure of Suzie and the sexual encounter

10   is the mechanism through which the nanobots are entered

11   into her body and preserve her against a plague that would

12   otherwise kill her.  The narrator in the story, the

13   father, talks about the fact that his younger sister has

14   run away, and the period in which this act should have

15   been held with her or done with her, and that the result

16   is that she has died, in agony, without any -- he comments

17   that there are no pain killers that will salvage someone

18   who is attacked by this plague.

19        It's obviously science fiction.  And the father is

20   obviously distraught in the course of this story that he

21   has had such a devastating effect upon his daughter.

22        In fact, Mr. McCoy's story is predicated on the fact

23   that the father, in order to do this act, has -- actually

24   takes a pill which drives him into some sort of total

25   amoral sexual frenzy that precipitates the very violence

1    that you are talking about.  And when he -- when the

2    effect of this pill wears off, he is incredibly distraught

3    at the potential that his daughter has actually died.

4    Q    The fact that he's remorseful somehow gives it

5    literary value.  Is that your testimony?

6    A    The fact that he is remorseful indicates a

7    complicated psychology within his character that gives it

8    literary value.

9    Q    Did you also just testify -- and again I'm using the

10   language you just testified to -- that there are cases

11   where work may be so disturbing that it does distract from

12   its literary value?

13   A    Yes, potentially.  It may distract from an initial

14   understanding of its literary value, which was obviously

15   the case in the works of the Marquis de Sade.

16   Q    We are speaking about the defendant's stories, was

17   that your testimony?

18   A    No, that was my general testimony.

19   Q    That was your general testimony?

20   A    The general testimony as to a historical pattern in

21   which literature that addresses sexual issues is often

22   found disturbing by contemporary audiences.

23   Q    It was your testimony that disturbing -- whether a

24   story is disturbing, the extent to which it is disturbing

25   can detract from its literary value.  Was that your

1   testimony earlier?

2   A     No.  My testimony is that can detract from its

3   reception and the understanding of the value, which in

4   historical context can be better perceived.

5   Q     So you are speaking about its distraction relative to

6   the audience who receives it?

7   A     Its initial audience, yes.

8   Q     And an audience in that case would be a reasonable

9   person or an average person in this community?

10        MR. FAKHIMI:  I object, Your Honor.  Professor

11  Richardson's testimony was only in support of the third

12  prong of the literary test, which is whether or not there

13  is or not serious literary value to the work.  Community

14  standards, Your Honor, do not come into play with respect

15  to the analysis of that prong.

16        In other words, Your Honor, literary value is

17  literary value throughout the country.  It does not differ

18  from community to community.  The other two prongs will

19  vary from community to community.

20        MS. FEBUS:  I have -- I'm sorry.  I have two

21  responses.  First, any fact that the expert, Mr.

22  Richardson, puts into evidence is something that the

23  government can cross him on.  He made a factual statement

24  about standards that I can reference to community

25  standards for prongs one and two.

1          I agree that community standards are not a prong of

2      three; but three, the third prong, rests on the perception

3      of the average person.  And I did ask the defendant that

4      question also.

5                  THE COURT:  I think he's answered about his view

6      about those who studied literature.  He's not previously

7      testified about the reasonable man's or average person's

8      standard.

9                  MS. FEBUS:  But he has testified extensively

10     about obscenity standards.

11                 MR. FAKHIMI:  I would disagree with that, Your

12     Honor.

13                 MS. FEBUS:  Well, he's testified extensively

14     about obscenity from the 1800s, what he thinks the

15     evolving view of sexuality is, what he thinks social mores

16     are, going to a hundred years from now.  He's testified to

17     these facts through direct testimony, and the government

18     should be able to pursue a line of questioning based on

19     what he's testified to.

20                 THE COURT:  Well, the Court sits in fact

21     finding.  I certainly have not considered -- evaluate the

22     evidence yet, but I don't recall him testifying at all

23     about obscenity as such, that was classified, you know.

24     So what you all are going to argue about what that means,

25     I don't know.

1          But as I understood it, his testimony is as a

2     literary expert, and you are about to ask him about what

3     -- how this is perceived by the average person or the

4     common person.  Is that -- am I right?

5               MS. FEBUS:  Yes.  Only because he is the one who

6     said that his -- his statement about how disturbing

7     elements of a work affect its literary value depends on

8     how it is perceived by an audience.  He just said that,

9     how it is perceived by the recipients.  And I'm asking him

10    who the recipients of this work would be.

11              THE COURT:  All right.  If that's what you are

12    asking, the objection is overruled.

13              MS. FEBUS:  Thank you.

14    BY MS. FEBUS, CONTINUED:

15    Q    Okay.  So back to that line of questioning.  I think

16    that we just established, but correct me if I'm wrong,

17    that your view about the literary value of this material

18    relative to whether or not it is disturbing, in part,

19    hinges -- I'm sorry -- in part relies upon or is relevant

20    to who receives his stories, who the audience is.  Is that

21    correct?  Did you just testify to that?

22    A    Yes.

23    Q    Okay.  Thank you.  Going to the 18 stories that you

24    testified about, you are discussing the relative literary

25    value of those.  Is that correct?

1    A    Yes.

2    Q    And during your testimony, through you and defense

3    counsel, there were references made to whether those 18

4    stories were drawn from the larger, what you are calling a

5    body of work.  Is that correct?

6    A    Correct.

7    Q    And you said that you reviewed all of the -- you said

8    that you reviewed, in response to defense counsel's

9    questions, approximately 240 stories?

10   A    Yes.

11   Q    There are approximately 276 stories.  Are you aware

12   of that?

13   A    I reviewed what I was given.

14   Q    Are you aware that the 18 stories that have been

15   specifically referenced -- I'm sorry.  And you were in the

16   courtroom I think during the part of the examination where

17   all those stories came into evidence.  Even if you

18   weren't, since you read all the stories, are you aware

19   that the 18 stories that have been focused upon during

20   this trial come from the defendant's writings which

21   started in about 1989/1990, and which he posted on the

22   Internet through 2007.  Are you aware that those 18

23   stories were taken from that time frame?

24   A    Yes.

25   Q    Okay.  So, if you are saying that you are considering

1    the defendant's stories as a body of work, isn't it fair

2    to say that the 18 stories that have been focused on by

3    the government and by the defense are representative of

4    that body of work that he wrote over that time span?

5    A    Only in regard to the time span.  That wasn't really

6    what I was asked to address.  I was asked to address the

7    literary quality of the work.

8    Q    Is it your testimony that the shorter a story is, the

9    less literary value it has?

10   A    The more difficult it is to, in isolation, discover

11   literary value.

12   Q    I am not talking an isolate -- I am talking about a

13   specific work.  You read all the stories.  You just talked

14   -- we talked about "********".  You talked about that one

15   story and you referenced another.  So I'm asking you your

16   expert opinion.  Is it your expert opinion that the

17   shorter a story is the less literary value it has?

18   A    The more difficult it is to ascertain literary value

19   in isolation.  The interesting thing about "********" is

20   that it is not one of the shorter stories that the

21   prosecution has selected.

22   Q    Exactly.  "********" is one of the longer stories.

23   Is that the case?

24   A    Right.

25   Q    Is it your testimony that the longer a story is the

R. DARLENE PINO
UNITED STATES COURT REPORTER
(229) 878-0111

```
1    more literary value that it has?
2    A    No.  Not necessarily.
3    Q    You also -- I'm sorry.
4    A    Not necessarily.
5    Q    You also spoke about the use of parody and spoof in
6    the defendant's stories?
7    A    Yes.
8    Q    Is it your testimony that simply using such a device
9    makes it serious?
10   A    It evidences a literary ability.  The ability to
11   manipulate literary technique.
12   Q    And you also testified -- again, your testimony ten
13   minutes ago -- that the parodies that you saw in the
14   defendant's stories occur, quote, infrequently and are not
15   necessarily pervasive?
16   A    That's true, but I had not quantified that
17   information.  My memory may be mistaken in that regard.
18   Q    Your memory may be mistaken in that regard?
19   A    Relative to the number of parodies in the 240 stories
20   that I read.
21   Q    Do you deny making that statement, though?
22   A    No.
23   Q    You also spoke about various narrative strategies,
24   spoke about points of view, and you characterize the
25   defendant's stories -- as again I'm quoting -- sexual
```

1  escapades.  Is that correct?

2  A    Yes.

3  Q    In the stories that you are referring to as sexual

4  escapades are ones that involve the rape and strangulation

5  by ejaculation of very young children, as young as four.

6  Is that correct?  Are those the stories that you are

7  referring to as mere sexual escapades?

8  A    No.

9  Q    So that story you wouldn't refer to as a mere sexual

10 escapade?

11 A    No.  Huh-uh (negative response).

12 Q    Do you recall which stories utilized folk tales?

13 A    Not offhand.  I'm sorry.  They are fairly easy to

14 find, and I guess I could discover that if you wanted.

15 Q    You also spoke about three themes or -- I'm sorry --

16 I think maybe it was four themes, the nature of love?

17 A    Yes.

18 Q    The difference between love and sexuality in society?

19 A    Yes.

20 Q    And how societies -- how society helps us construct

21 our view -- I guess our view of sexuality and how we

22 relate to one another?

23 A    Yes.

24 Q    And that's how you qualify the stories?

25 A    Those are three of the themes that I mentioned, yes.

```
 1   Q    And you also called the stories romance stories.  Is
 2   that correct, your testimony yesterday?
 3   A    Yes, in terms of the basic structures.
 4   Q    And then you also, a couple minutes ago, testified to
 5   what you considered to be political themes in the
 6   defendant's stories?
 7   A    Yes.
 8   Q    Yesterday you testified on direct that the
 9   defendant's stories are or may be considered taboo.  That
10   was the language that you use.  Is that correct?
11   A    I don't remember using that language.
12   Q    We can check the record, but you used the term taboo
13   to describe some of the defendant's stories.
14   A    Oh, I am I'm sorry.  I do remember the context in
15   which you -- which I did it.
16        What I was talking about was that he had used the
17   last or one of the last sexual taboos in our culture in
18   order to make the stories, in some senses, as shocking as
19   they might be in order to get us to get the audience to
20   think about the themes involved.
21   Q    When you say audience, who are you referring to?
22   A    His readers.
23   Q    Is it correct -- is my now characterization correct
24   that you referred to the stories -- defendant's stories as
25   taboo, and I think this was maybe similar to what you just
```

1    said, because they do involve the rape and incest of --

2    you know, between fathers and mothers and very young

3    children?  Is that --

4    A    Yes.

5    Q    -- the nature of the defendant's stories?

6    A    I mean -- Yes.

7    Q    Okay.

8              MS. FEBUS:  May I have one second?

9              THE COURT:  You may.

10   Q    Can you, as a literature professor, someone who

11   studied the English Language, can you give me your

12   qualified definition of the word taboo?

13   A    A taboo is a social construct that violates essential

14   morality within a particular culture.

15   Q    Okay.  And again, you reviewed all the defendant's

16   stories.  Is that correct?

17   A    Yes.

18   Q    And you testified -- I would need to talk about this

19   a little more.  Your qualification or your view of the

20   defendant's stories, rather, are mainly -- you called them

21   yesterday, and I'm quoting again, basic romance plots?

22   A    Right.

23   Q    I want to refer you to Government Exhibit 5-D, which

24   should be in the book that you have in front of you.  5-D

25   is a story called **** * *** ** ****, and it's been

1    entered into evidence.

2    A    Yes.

3    Q    Do you recall reviewing this story in preparation for

4    trial?

5    A    Yes.

6    Q    Do you recall our discussion a few minutes ago about

7    how you viewed the relative length or shortness or brevity

8    of a story in relation to its literary value?

9    A    Yes.

10   Q    I would like to ask you to read -- and this is --

11   this is -- I'm sorry -- this is one -- and we also spoke

12   about "********", which is one of the longer stories of

13   the defendant's.  Okay.  So this is one of the shorter

14   defendant's stories, right?

15   A    Yes.

16   Q    Okay.  I would like to ask you, have you, with the

17   Court's indulgence, read this relatively short story.

18   It's two pages and then there are two sentences on the

19   third page.

20   A    *** ******** ****** *** ****** **** ** **** ********

21   *** * **** *** ***** ******** **** ****** ****** ** ** **

22   ********

23        **** * **** ** ***** ***** ****

24        ** ***** *****  **** ****** *********** ********* **

25   *******  **** ***** *** *********

R. DARLENE PINO
UNITED STATES COURT REPORTER
(229) 878-0111

1      ******* ** ** *** ****** ***** *** **** *******

2    *******

3      ** ****** **** *** ***** ** ** **** ** ***** ** ****

4    ****** ** ** ******* ** ***** **** ******** **** *

5    ******** ****** *** ****** ********* ** *** ****** * *****

6    **** **** ****** *** ***** *** **** **** *** *** ****** *

7    **** ** *** ****** ****** ** ** **** ** ******** *****

8       *** **** * ****** ** *** *** ** ******** ********** **

9    ******** ******* *** ********* ** ******* ** *** *******

10   *** **** ****** *** ** *** **** ****** *** *** ** ********

11   **** *** *** ******* ******

12     ** ** *** ****** * ********** ******* ** **** *** ***

13   *** ** *** *** ******* **** **** ** ** ********

14   ********** ********** ****** ******** ***** *** *****

15   **** * ******

16     ***** **** * ****** *** ******* ** ** ******* ****

17   ***** ** ******** *** **** ** **** *** ***** ****

18   *** * ****** **** **** ** **** * ****** **** ******

19     ** ***** *** ** ******** **** ***** ** ****** ** ****

20   ** *** ******* ** ******* **** ***** * **** ** ***** **

21   ** ** *** **** *** ** ** ******* *** ***** * *****

22   ****** **** *** ******** ******** ******* * ***** ***

23   ***** *** ****** ***** **** ** *** ** **** ****** **** *

24   *****

25     ***** ** ******* *** ******** ****** ** ******* ****

1  **** ***** **** *** ****** **** ****  * ***** ******* ****

2  *** ****** ***** ** *** **** ********** ** ** *** ** **

3  *** **** ****** **** *** *** *** ******

4      ********** *** ******* ******* **** ** **** ******

5  ***** * ****** **** ******* ** ***** *** **** ***** *****

6  ****** ** ******** **** * **** ****** ** *** **** ** **

7  *****  ***** **** ** *** ***** **** ***** ** *** *****

8  **** ** ******** **** ****** ***  *** ****** ******

9  ******** **** **** **** *********** ***** ****

10     ********* **** **** **** ************ ***** ***

11     ***** *** **** ** ****** ******* ******* **** *******

12  ******* **** **** ** ******

13     ** **** ***** **** ***** *** ***** *** **** ***

14  ***** **** ****** ** ** ******** **** *** ***** ********

15  **** ** *****  * ********* ******* ** **** *** *** ******

16  *** ****** ****** ***** ***** * **** ***** ** ********

17  ******** *** ******** ****** **** *** ******

18     ****** *** ** ****** ********** **** ** ** **** ***

19  ****** ** ******* **** ***** ******* ** **** **** ***

20  *******  * ***** *** ** *** ****** ***** ** ** ******* **

21  **** **** *** **** *** ****** ******* ** **** *** ***** *

22  ***** *** ***** ****

23     **** ** ******* *** **** **** *********** **** ****

24  ******* **** ** *** * ******* *** ***** ** **** *** ***

25  **** *** ******

R. DARLENE PINO
UNITED STATES COURT REPORTER
(229) 878-0111





1    *** *** **** **** ******* *** ***** **** ** *** ***** ***

2    **** ***** *** ** *** ** ** ** **** ** **** ** ** *

3    ****** **** **** *** ****** ********* *** **** ***** ****

4    *** ******* ***** ****** ***** *** ****** ** *** ***

5    ****** **** ******* **** **** ******

6        ****** ******  * **** *** *** ********* **********

7    ** **** **** *** ****** *** ********* ** ********* *****

8        *** *** * *** ****** ****** ** * ****** ***** **

9    ***** **** *******  *** *** ***** ** ****** ******* ** **

10   *** *** ****** ** ****** **** **** **** ** *** ********

11   ********* *** *** *** **** *** ****** *** ********* **

12   ***** **** ** ******* ** ****** *** *********** *******

13   **** *** **********

14        ***** ******  * ****** **** *** **** ** ** **** *

15   *** ********

16   Q    Is this one of the stories --

17        THE COURT:  I'm sorry.  I need to stop you right

18   here.  There's a matter the Court needs to address so

19   we'll take a recess for about 15 minutes.

20        (Recess)

21        THE COURT:  All right.  Thank you.  We can now

22   continue.  I don't think there will be any more

23   interruptions.

24        MS. FEBUS:  Thank you, Your Honor.

25   BY MS. FEBUS, CONTINUED:

1    Q    Mr. Richardson, we had just ended and you had just

2    read into the record for the Court Exhibit 5-D, which was

3    a story titled "Can I come in her."  Is that correct?

4    A    Yes.

5    Q    And before I asked you to read that story into the

6    record, we were discussing your characterizations of the

7    defendant's stories as romance plots?

8    A    Right.

9    Q    Is that a story that in your professional opinion you

10   would qualify as a romance plot?

11   A    Probably not.  This one would arrive at a -- A

12   romance plot usually looks at some sort of courtship in

13   which an affiliation is not necessarily already been made.

14   Q    Is this one of the stories that you referred to then

15   as having political value?

16   A    Uh, in the sense that this is a story that in

17   totality brings up the issue, yes.

18   Q    You testified yesterday about a literary device

19   called close reading.  Is that correct?

20   A    Yes.

21   Q    In the expert summary and you testified yesterday

22   about the definition of close reading.  You explained to

23   us what it was, and I want to  make sure that I capture

24   that.  Close reading involves a careful and sustained

25   interpretation of a passage or passages of a text placing

1    great emphasis on the particular over the general.  Is

2    that correct?

3    A    Yes.

4    Q    That technique is different though from reading

5    stories as a whole.  Is that correct?

6    A    It is a technique of reading stories that can be

7    deployed in the totality of a work.  A whole work could be

8    read closely.

9    Q    But the definition for close reading involves placing

10   great emphasis of the particular over the general?

11   A    My use of the word particular in that circumstance

12   referred to looking at the way in which literary language

13   is deployed as opposed to the way language is deployed

14   generally.

15   Q    Okay.  Again, I just want to focus on the definition

16   that you gave and that is in your expert witness notice,

17   which is that close reading is a sustained interpretation

18   of passages of text, placing great emphasis of the

19   particular over the general.  Is that the definition of

20   close reading?

21   A    I can live with that definition.

22   Q    Yesterday you also testified about works that have

23   been deemed obscene in the past or have been criticized

24   for having obscene content.  Is that correct?

25   A    Yes.

1   Q    You testified about evolving social mores and taboos

2   and sexuality.  Is that also correct?

3   A    Yes.

4   Q    You testified by those matters in the context of

5   rendering your expert opinion about literary value whether

6   it is serious.  Is that correct?

7   A    Yes.

8   Q    Are you aware that stories strikingly similar to the

9   defendant's have been recently held to be obscene?

10  A    No.

11  Q    You testified yesterday going through -- and I

12  believe this was in the context of going through your

13  qualifications as an expert, but also a little bit in your

14  substantive testimony about peer review.

15  A    Yes.

16  Q    And you testified that you have written works that

17  had been peer reviewed?

18  A    Yes.

19  Q    And when you use the term peer review -- and again, I

20  want to understand the manner in which you are using it

21  and the manner in which your literary community of

22  professors would use it.  I understand that to mean a

23  process by which something is proposed as a research

24  product or a publication and is evaluated by a group of

25  experts.  Is that a fair definition?

1    A    Yes.

2    Q    To the best of your knowledge, have any of the

3    defendant's stories been peer reviewed?

4    A    I have no knowledge.

5    Q    Do you -- and also speaking about what you -- you

6    qualified yourself as an expert yesterday.  Is it correct

7    that you currently teach?

8    A    Yes.

9    Q    Would you teach any of the defendant's stories as an

10   exemplar of the use of literary devices in any of your

11   classes?

12   A    No.

13   Q    You testified yesterday that the defendant may have

14   -- and I think you are talking about the political arm of

15   whether a piece of work is serious.  You testified that

16   the defendant may have used these stories to communicate a

17   certain message to his audience.  Is that correct?

18   A    Yes.

19   Q    And perhaps a certain political message you testified

20   to that yesterday and a few --

21   A    Yes.

22   Q    -- minutes ago.  Are you aware of some of the

23   prologues and some of the other materials that have been

24   brought into evidence?  I think you are because you were

25   in the courtroom.  The defendant has stated when directing

1    and talking about his stories to his audience that he

2    initially wrote his stories for his own enjoyment and that

3    he then self-describes those stories as including

4    scenarios -- and excuse my language -- "where if a little

5    girl has sex or gets fucked, it is because she wants to

6    get fucked and she asks for it."  Are you aware that

7    that's how the defendant has described some of his own

8    works?

9    A    Not exactly in those words, but, yes, I mean I am

10   aware.

11   Q    What is the political message in a story that

12   describes that type of sexual activity?

13   A    The political message attaches to the totality of the

14   work, in that he's raising issues about sexuality.

15   Q    I'm sorry.  I'm sorry.  I need to reask that.  Is the

16   way that he -- excuse me for doing that -- is the way that

17   he describes his stories, is that in the form of a

18   political message?

19   A    It is not -- does not overtly use political language,

20   but I cannot at this moment run through an exhaustive

21   potential use of all the ways political points might be

22   made.  It is indeed possible that he is doing this in

23   terms of raising the issue.

24        In other words, in this story, for example, the one

25   that you asked me to read into the record, we have a

1    teenage girl, her father and mother.  We do not have any

2    idea how old this teenage girl is.  We do not have any

3    idea whether or not she is old enough under the particular

4    jurisdiction, if we were to predicate this as being an

5    incident happening within effective United States.

6    Q    Do you recall in that story her being described as

7    being very young?

8    A    No, I don't.  She's described as a teenager.  This

9    could be 13, this could be 19.

10   Q    And in your opinion, is the age of a child relevant

11   to the literary value of a text or a story?  Is that what

12   you were getting at?

13   A    No, that's not what I am getting at.  What I am

14   getting at is in this particular story we have a young

15   woman who might well have surpassed the age of consent as

16   defined in the jurisdiction in which she exists.

17   Q    Are you testifying to a matter of law right now?

18   A    No, I'm describing a possibility.

19   Q    Did you refer to the age of consent and the

20   jurisdiction?

21   A    Yes.

22   Q    Is that -- I mean that's a legal term, that's a legal

23   reference?

24   A    Right.

25   Q    Are you qualified to testify to legal matters?

1   A    To the extent that I know them.

2   Q    Are you qualified here as a legal expert in obscenity

3   law?

4   A    Yes.

5   Q    You are --

6   A    No, not in obscenity law.  No.  Excuse me.  I'm

7   sorry.

8   Q    You also testified to your thoughts about how society

9   views sexuality.  Is that correct?

10  A    Uhm, I raised the issue of the fact that society does

11  have attitudes about sex, yes, and sexuality.

12  Q    You testified yesterday that some of the defendant's

13  stories may have been written for sexual gratification?

14  A    I don't remember testifying to that.

15  Q    Yesterday you testified that -- or you described,

16  rather, in your testimony that the defendant's stories may

17  be merely a pure -- and again, quoting from you --

18  fictional musings.  Is that correct?

19  A    Yes, in the sense that they are fiction.

20  Q    Did you use the term fictional musings?

21  A    Yes.  Well -- no, I don't remember that phrase, but I

22  won't object to it.

23  Q    In that opinion, where you did use the phrase

24  fictional musings, was that -- that was relevant to your

25  determination or your opinion about the literary value of

1    the stories, correct?  The part of your general testimony

2    you used the term fictional musings?

3    A    Yes, this is not a work of fact.  It is not even a

4    work of creative nonfiction.

5    Q    It is not a work of fact and it is not a work of

6    creative nonfiction?

7    A    Correct.

8    Q    What you've just said informs -- again, I want to

9    make clear -- informs your view of whether this is work

10   that has serious literary value?

11   A    It --

12   Q    That it is not fact?

13   A    Yes, it informs my view that literature as distinct

14   from other varieties of writing.

15   Q    I'm asking you specifically about the defendant's

16   stories which is what you are here to testify about.

17   A    I am here to qualify these stories within a broader

18   compass of what literature is.  In order do that, I must

19   rely upon my expert sensibility as to what that

20   constitutes.  That constitutes something that is not based

21   in fact.

22   Q    So my simple question is, you used the term fictional

23   musing to discuss the literary value of the defendant's

24   stories generally and the defendant's stories in

25   particular, and part of fictional musings is that they are

1    not based in fact?

2    A    Correct.

3    Q    And that you just said forms your opinion about the

4    literary merit of these stories?

5    A    The fact they are not factual, yes.

6    Q    Hypothetically, if some of these stories were based

7    on actual incidents of child abuse, sexual abuse, rape,

8    molestation, would that change your view given what you

9    just testified to?

10   A    It would recategorize what I am looking at.

11   Q    Okay.

12   A    Truman Capote's "In Cold Blood" is a fictional

13   rendering of a demonstrable murder.  It is entitled

14   creative nonfiction.

15   Q    Okay.  Can you give the Court an example of a text

16   that you would find obscene?

17          MR. FAKHIMI:  Object, Your Honor.  Again, the

18   witness is here not to testify as to either of the two

19   prongs of the Miller obscenity determination with the

20   exception of literary value, the third prong.

21          Government counsel is calling on the witness to

22   speculate as to a work that would satisfy the first two

23   prongs, which is neither within the scope of his testimony

24   nor within the area of his expertise.

25          MS. FEBUS:  The witness is testifying he's an

1    expert who has studied in all manners of literature, both

2    American, Irish, and French as he testified yesterday.  I

3    will happily rephrase the question.

4    BY MS. FEBUS,CONTINUED:

5    Q    And I will simply ask, can you give the Court an

6    example of a text that is short and a text that is longer

7    per your earlier testimony where you found that it doesn't

8    have literary value?

9    A    My difficulty is that I don't read this kind of

10   material as recreational literature, and it does not fall

11   within the purview of my normal teaching, and therefore,

12   I'm sure if we wanted go to an adult bookstore I could

13   find something, but --

14   Q    But in your expert opinion testimony as you are

15   giving it to this Court today, your answer is that you

16   cannot?  And you have also just now stated that you are

17   not familiar with this type of what you are calling

18   literature.  Is that what you just stated?

19   A    To the extent that there is literature that has been

20   considered obscene in the past, I have read that

21   literature.  Usually in the context of --

22   Q    I'm asking you if you can give an example of a

23   writing, a text similar in length and kind to what you

24   have been testifying about for the past two days, where

25   you have found that it does not have literary value or

1    serious literary value?

2    A    There are passages in the Marquis de Sade's work that

3    I find obscene.

4    Q    I am not asking you about obscenity.  Defense counsel

5    just popped up and said you couldn't testify about that.

6    I'm simply asking you if you have come across a text that

7    you have found not to have literary value.  Are you saying

8    that you have come across text passages in the Marquis de

9    Sade that do not have literary value?

10   A    To my mind --

11   Q    That's the question I'm asking you.

12   A    To my mind, they do not.

13   Q    So you have come across text in that context that

14   does not have literary value, but all of the 276 stories

15   of the defendant that you read, all those have literary

16   value, where all those taken as a whole have literary

17   value?

18   A    Taken as a whole, yes.

19            MS. FEBUS:  No further questions.

20            THE COURT:  All right.  Is there any redirect?

21            MR. FAKHIMI:  Yes, please.

22            THE COURT:  All right.

23                    **REDIRECT EXAMINATION**

24   **BY MR. FAKHIMI:**

25   Q    Professor, do you book speaking engagements?

```
1    A    Yes.

2    Q    You get paid for your work when doing those?

3    A    Yes.

4    Q    Does that include the preparation time and the

5    research necessary for the speaking engagement as well as

6    the engagement itself?

7              MS. FEBUS:  Objection.

8              THE COURT:  Just one minute.

9              MS. FEBUS:  Objection as to relevance.

10             MR. FAKHIMI:  You were asking our expert if he

11   got paid.

12             THE COURT:  Let me just tell both of you all

13   something.  I am not a jury.  I am a judge.  I know that

14   witnesses get paid.

15             MR. FAKHIMI:  Right.

16             THE COURT:  You know.

17             MR. FAKHIMI:  Very good, Your Honor.

18             THE COURT:  Not witness but witnesses called as

19   experts.  So to the degree that that has any factor that

20   the Court takes into consideration that appears to affect

21   the witness' credibility the Court will take that into

22   account.  So unless there's something else you think you

23   need to point out to me specifically, the Court is well

24   aware and would expect this witness to be paid for his

25   appearances as well as his testimony as an expert.
```

```
 1              MR. FAKHIMI:  Very good, Your Honor.  Thank you.
 2              THE COURT:  All right.
 3    BY MR. FAKHIMI, CONTINUED:
 4    Q    Professor, does your expert opinion of the relative
 5    literary value of either an individual work or a body of a
 6    work as a whole in any way depend on someone else's
 7    assessment of literary value in that work?
 8    A    Only to the extent that I might share certain
 9    expectations about the nature of literature.  To the
10    extent that given those set of expectations we would reach
11    a similar conclusion, the answer would be perhaps.
12         But I don't necessarily rely on other people to tell
13    me what I should think about these works any more than I
14    would on a play by Shakespeare.
15    Q    Therefore in your capacity as a literary analyst, you
16    are able to analyze for literary value a single story or
17    body of work and you will reach your con -- and you can
18    reach a conclusion that would stand independent of other
19    people's conclusions, as to the same analysis?
20    A    Absolutely.
21    Q    Very good.  I would like to ask you if you could,
22    please briefly relate for the Court the premise and the
23    story of "********".  How does it start, what happens, and
24    how does it end?
25    A    The story is predicated in either an alternative
```

1   universe, which from a human perspective would be seen as

2   postapocalyptic.  Some plague has overtaken a population.

3   The characters in the story are presented as humanoid.

4   The plague apparently attacks people, and unless they

5   receive some sort of treatment, they die a horrible

6   painful death.

7       The precipitating cause of this plague is or was a

8   scientist with a sort of strictly religious fanatical kind

9   of attitude who has melded technology to a religious

10  perspective.  And in order for males and females to

11  survive, they must engage in intercourse, and they must

12  engage in intercourse at or about the time that, at least

13  in terms of the females, that the females begin to have

14  menstrual cycles.  And evidence appears that the youngest

15  daughter of the central male character has entered that

16  period of her life, and therefore, it is necessary for him

17  to have sex with her.

18      There is a -- the natural reluctance -- the implied

19  natural reluctance of the father to have intercourse,

20  especially with a child as young as the girl in question,

21  has been widely recognized within the society, and

22  therefore to overcome that, a mechanism has been devised

23  which essentially removes the qualms of conscience and

24  allows the kind of violent sexual violation that's

25  necessary.

1          The story entails a young woman being violated in

2     this way.  And in the process of insemination, certain

3     kinds of nanobot technology is introduced that essentially

4     repairs all of the damage that has been done to her.  The

5     father takes the pill, commits these acts, essentially

6     comes out of the drug induced haze, is incredibly

7     remorseful at what he has done, and the technology repairs

8     his daughter, and there's a kind of happy ending that she

9     has been saved from this horrible death that haunts her

10    father, as I mentioned before, because of his own sister's

11    death.

12    Q     So the story has a happy ending?

13    A     Yes.

14    Q     If we can talk briefly about the story that

15    government counsel asked you to read into the record.  It

16    was only two pages long, a sentence or two on the third

17    page.  From whose point of view is that story narrated,

18    Professor?

19    A     It is narrated from the point of view of the teenage

20    girl.

21    Q     Thematically, what does that short story deal with?

22    A     Well, thematically it deals with, certainly,

23    sexuality.  Ironically, the young girl obviously wishes to

24    please her father by providing him a kind of sexual

25    pleasure.  It is a -- it is the rendering of a world in

 1    which none of the characters in this episode seem to have

 2    any moral objections to incestuous relationships, unlike

 3    most of society would; and therefore, raises the issue of

 4    whether or not our views on sexuality are in some

 5    instances prescribed by external as opposed to internal

 6    conceptions.

 7         In other words, is there any inbred or inherit

 8    objection to incestuous sexual relations between people or

 9    has society deemed those immoral and certainly illegal for

10    its own purposes and for its own reasons?  So it raises

11    these issues and asks implicitly the reader to think about

12    those issues and whether or not we wish to reconceive

13    this.

14         The point that I was trying to make on cross was as

15    we don't know how old this girl is as opposed to other

16    stories in which the age of the young girls are -- is made

17    explicit, the question we have here is, you know, this is

18    supposedly a teenager and that raises the issue of how

19    knowledgeable can she be, how mature is she to make the

20    kind of decision that she makes on her own.

21    Q    Interesting.  Professor, government counsel, on cross

22    examination, briefly discussed with you the analytical

23    technique of close reading, and focused in on the words

24    that it is a careful scrutinization of a passage or

25    passages from a work or of a work.  When analyzing these

1    stories using this analytical technique, did you apply the

2    technique to the entire works or to just some passages?

3    A    I applied the technique to the entire work.  If one

4    were to actually render such a reading, the result would

5    be so voluminous that it would be impossible to ever move

6    beyond for in terms of conversation sake.  So when I refer

7    to passages, usually passages are presented as

8    illustrative of larger patterns that are seen in the work

9    as a whole.

10   Q    Lastly, Professor, government counsel asked you if

11   you would be willing to teach this material in your

12   literary classes to your students, you said you were not.

13   Are there other pieces of serious literature that you

14   would not be willing to teach in your classes?

15   A    Yes.  It was more -- My response was predicated on of

16   all the literature that I have at my disposal to teach,

17   what am I going to select, and these would not be at the

18   top of my list.  But then again, Francis Trollop's novels

19   would not be at the top of my list either, and they are

20   certainly as prim, proper, and seriously literary as you

21   could possibly wish for.

22   Q    Thank you, Professor.

23        MR. FAKHIMI.  I have no further questions,

24   Judge.

25        THE COURT:  All right.  Let me ask this

1   question, and I'll give both of you an opportunity to ask

2   later.  I should have asked these after the government's

3   cross.

4        Professor, you have referred to the defendant's work,

5   now the Court has been told about 240-something stories,

6   18 that have been put into evidence here, and what I think

7   of, of course, you think of a work by Shakespeare, you

8   know, Julius Caesar being a work, and then you think of

9   Shakespeare's entire work.  Explain to me how do you --

10  how is it that you view these as not individual works and

11  -- In other words, are there two ways to look at it, are

12  they to be looked at as individual works and then to be

13  looked at as an entire work?  And if so, why is that and

14  what is the significance of it?

15       THE WITNESS:  Well, Your Honor, if we were to

16  make assessments of any writer's work based upon a single

17  instance of that writer's works, we might well come to

18  different conclusions about the relative quality of that

19  writer's efforts.

20       For instance, I teach Shakespeare.  I almost never

21  teach the three Henry the Sixth plays because Shakespeare

22  wrote better plays.  And if I were to assess Shakespeare's

23  work solely on the basis of one of those plays, I might

24  consider him a quite mediocre playwright.  He got better

25  as a writer.  And therefore, if I'm going to evaluate the

1   totality -- or if I'm going to estimate Shakespeare's

2   work, I need to read the whole thing and I have, and in

3   some senses, I read everything that was here.  I was asked

4   to make an evaluation about the serious nature of all of

5   these, and that's what I have attempted to present to the

6   Court.

7          THE COURT:  All right.  First of all, do you

8   have any questions further based on the Court's questions?

9   I'll give the government the same opportunity.

10         MR. FAKHIMI:  No, Your Honor, I do not.

11         THE COURT:  All right.  Does the government have

12   any questions of the witness based on the Court's

13   questions?

14         MS. FEBUS:  Yes, one question.

15              **RECROSS EXAMINATION**

16   **BY MS. FEBUS:**

17   Q    In your classes and as a general matter of teaching,

18   we've all been to college, when you teach the general

19   works of an author, do you often take a sampling of the

20   works that span the spectrum of that author's scholarship?

21   A    Yes.

22   Q    Is that correct?

23   A    Yes.

24   Q    You can take a sample of what spans over the course

25   of that person's entire writings to be representative of

1    their work as a whole as you have referenced it?

2    A    Careful selection would allow for that, yes.

3             MS. FEBUS:  Thank you.

4             THE COURT:  All right.  Any further, Mr.

5    Fakhimi?

6             MR. FAKHIMI:  Yes, Your Honor, actually I do

7    have one quick question.

8                  **FURTHER REDIRECT EXAMINATION**

9    **BY MR. FAKHIMI:**

10   Q    Professor, you have scrutinized these works as a

11   whole, en masse, all of them, and then you see these 18

12   that have been selected.  You just mentioned a careful

13   selection may allow for characterization of a subset as

14   being congruent with the whole?

15   A    Correct.

16   Q    Is this such a careful selection, these 18 stories?

17   A    In my opinion, it is not.

18   Q    It is not?

19   A    It is not.

20            MR. FAKHIMI:  Thank you.

21            THE COURT:  All right.  Further recross?  Is

22   that it?

23            MS. FEBUS:  No.

24            THE COURT:  All right.  Is there any objection

25   to the witness -- I guess he's a stay at the court

1    witness.  All right.  So you may step down at this time.

2              THE WITNESS:  Thank you, sir.

3              THE COURT:  All right.  You may call your next

4    witness.

5              MR. FAKHIMI:  Your Honor, at this time, the

6    defense rests.

7              THE COURT:  All right.  Is there any rebuttal

8    from the government?

9              MS. FEBUS:  No, Your Honor.

10             THE COURT:  Okay.  All right.  Let's see.  We

11   can do this a number of ways.  Do you all want to be --

12   wish to be heard in oral argument for any particular

13   period of time or do you want to submit a written argument

14   to the Court?  Obviously the Court has to take some time

15   to review the evidence as presented.  The Court will not

16   be rendering a decision immediately.  So if you want to do

17   a combination of those, I'll -- I'm open to a suggestion.

18             MS. FEBUS:  Your Honor, I think it would be

19   consistent with the bench memos that we tendered to the

20   Court earlier to submit written responses if defense

21   counsel would agree.  If not, the government is prepared

22   to proceed with an oral and perhaps an additional written

23   response.

24             THE COURT:  Okay.  All right.  Mr. Fakhimi?

25             MR. FAKHIMI:  Your Honor, we have no objection

1    to filing argument in writing as opposed to handling it

2    here today.

3         We would like to renew our Rule 29 for the record,

4    and we do that here and incorporate the arguments therein

5    by reference.  If we may be allowed in these written

6    pleadings that will be coming for briefings to further

7    elaborate on those arguments as well, we would appreciate

8    that.

9              THE COURT:  Well, I don't want to mix the two

10   things up.  That's just a renewed motion for the reasons

11   stated earlier.

12             MR. FAKHIMI:  Very well.

13             THE COURT:  All right.  I mean, the Court's --

14   First of all, the Court has withheld its ruling on the

15   earlier motion and will handle that as stated.  Also, the

16   renewal of your motion, the Court takes the record as it

17   appears.

18             MR. FAKHIMI:  Just so that I make sure I'm of

19   the same understanding as everyone else.  The written

20   briefs that will be forthcoming will be an attempt to

21   revolve the difference between us and the government as it

22   was manifested in the separate bench memos that were

23   filed.  Is that --

24             THE COURT:  No.  No.  I mean, you can make your

25   -- you can make a closing argument now to me --

```
1              MR. FAKHIMI:  I see.

2              THE COURT:  -- as to what you believe has not

3    been proved or proved, whichever the case may be, or let

4    it go at that, or if you want to just give the Court a

5    written -- since the Court will be considering this some

6    time you might want to put your closing argument in

7    writing.

8              MR. FAKHIMI:  I do.  We would like to put our

9    closing argument in writing, Judge, but I do have some

10   legal argument I would like to present to the Court.

11             THE COURT:  Yes.  That's what I'm saying.  I

12   said it could be a combination of those, but obviously if

13   you are going to make a written argument to me later, you

14   can be more selective about what you want to talk to me

15   about today or -- in terms of the time to give to it.

16             MR. FAKHIMI:  I see.

17             THE COURT:  How much time do you want today?

18             MR. FAKHIMI:  Well, actually I may be able to

19   submit those to you in writing along with the closing

20   argument, Judge.

21             THE COURT:  Let me let you all take a few

22   minutes.  Maybe it's unfair of me to ask you that.  Well,

23   I guess I got ahead of myself again.

24               **DEFENDANT'S ADVICE OF RIGHTS**

25             THE COURT:  The defense rested, but I think -- I
```

R. DARLENE PINO
UNITED STATES COURT REPORTER
(229) 878-0111

1    advised Mr. McCoy yesterday of his right to testify or

2    not.  And what I'll ask to you today, Mr. McCoy, did you

3    have sufficient opportunity to discuss that matter with

4    your attorneys?

5              DEFENDANT MCCOY:  Yes, I have.

6              THE COURT:  All right.  And of course, you were

7    not called as a witness.  Was it your decision not to

8    testify in this case?

9              DEFENDANT MCCOY:  Your Honor, I was, and quite

10   happy to have my lawyers take the -- my case for me --

11   because I'm definitely not the speaker.  He did a good

12   job.

13             THE COURT:  Okay.  So in other words, it was

14   your choice not to testify?

15             DEFENDANT MCCOY:  Yes, it was.

16             THE COURT:  All right.  By your response to me,

17   I think I know the answer to this question also.

18        You don't believe you were unduly influenced or

19   coerced in any way not to exercise that right?

20             DEFENDANT MCCOY:  No, Your Honor.

21             THE COURT:  All right.  That is noted for the

22   record.

23        Also we have a written document that we usually

24   execute just so we have a written record where, with

25   counsel, you sign off indicating that you decided not to

1    testify and that was your decision.

2              DEFENDANT MCCOY:  I signed it.

3              THE COURT:  All right.  That was already signed?

4              DEFENDANT MCCOY:  Yes.

5              THE COURT:  All right.

6              MR. FAKHIMI:  Wait --

7              THE COURT:  I think he's probably talking about

8    the plea.  But there's a document she'll run for you with

9    the caption of the case.  If you will sign that and place

10   it in the record.

11        Let's take a short recess --

12        Thank you, Mr. McCoy.  You may sit down.

13        -- and let you all think about that, as to whether

14   you want to do a combination.  I don't have a problem with

15   you doing some summary, but I don't think it needs to be

16   an extensive argument today.  I think while it's fresh in

17   the Court's mind and yours, there maybe some comments you

18   want to make and then make a more complete and full

19   argument in writing.  I'll let you all think about it.

20        (Recess)

21             THE COURT:  All right.  The Court has received

22   the formal waiver of testimony, and I'll sign it.  It will

23   be -- This is your signature, is that right, Mr. McCoy?

24             DEFENDANT MCCOY:  Yes, Your Honor.

25             THE COURT:  All right.  All right.  Madam Clerk,

1    it may be filed for the record.

2         All right.  Did you all, I guess, discuss among

3    yourselves and between the parties as to what procedure

4    you would like to follow for closing?

5              MS. FEBUS:  Yes, Your Honor.  I believe the

6    parties have agreed that we would submit written closing

7    arguments.  The only thing that we would request, because

8    we want to do so while everything is fresh, is that we

9    have a date certain within the next two weeks to do that,

10   a date on which we'll agree to file our papers.

11             THE COURT:  Do you all have any needs of the

12   Court transcript or anything of that nature before you?

13             MS. FEBUS:  We discussed that.  If we get it in

14   time, that will be fantastic.  I don't think we think it's

15   necessary.  And I think the Public Defender is going to go

16   through the process of requesting an expedited one.

17             THE COURT:  Let me see your calendar.

18        It's not an extensive written record as such, but

19   there are other demands.  Okay.

20        All right.  Let me do this.  I think two weeks from

21   today will be the 27th --

22             MS. FEBUS:  Yes.

23             THE COURT:  -- of January.  Okay.  And what I'll

24   do is I'll set it for the 27th **or** upon the date that the

25   transcript is available, if it is approved to be, that the

1    government will file its closing argument, not to exceed

2    20 pages, and then seven days thereafter, the -- what I am

3    going to do is treat it as much as it would be like in the

4    actual court, that is to let the government file its

5    closing or its opening closing in the sense, first; then

6    seven days thereafter, the defense will file its argument;

7    and then the government, seven days later, will be able to

8    file a rebuttal.

9        So that would be 20 pages for each on the main

10   arguments; and ten pages limit on the rebuttal, for a

11   seven day interval.  All right.

12            MS. FEBUS:  Thank you.

13            MR. FAKHIMI:  Thank you, Your Honor.

14            THE COURT:  So the anchor date is the 27th of

15   January unless that needs to be extended due to the

16   availability of an approved transcript.

17        Anything else?

18            MS. ROSEBERRY:  Yes, Your Honor.  We need to

19   marshal the evidence.  There were several items contained

20   in the government's notebook that were not entered into

21   evidence.  Some were not tendered at all.  Some were not

22   mentioned in testimony.

23            THE COURT:  All right.  What I will normally do

24   with that is give you all an opportunity to meet with the

25   Clerk to see whether you agree as to what is in the

1    record.  If you do, that closes the issue; if not, then I

2    can resolve it.  Okay.

3         I think I kept a pretty accurate record of what was

4    tendered and what was admitted, but it certainly not all

5    that was in the --

6         MS. ROSEBERRY:  I did.

7         THE COURT:  All right.  Okay.  You all let me

8    know if you need -- if the Court needs to come back in or

9    not.  Otherwise, we'll suspend pending the closing

10   arguments being filed.

11        All right.  Thank you all very much.

12        (Recess)

13

                          **CERTIFICATE**
14
     I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
15   TRANSCRIPT OF THE PROCEEDINGS.

16

17
     /s/_____
18   R. DARLENE PINO                        JANUARY 19, 2010
     UNITED STATES COURT REPORTER
19   Certified Shorthand Reporter (Fl)
     CB King Federal Courthouse
20   201 West Broad Avenue
     Albany, Georgia 31701
21   Phone:(229)878-0111
     E-mail:  Rdpino@cybercove.com
22

23

24

25