```
 1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF GEORGIA
 2                        ALBANY DIVISION

 3                 CASE NO. 1:07-CR-18(WLS)

 4

 5

 6   UNITED STATES OF AMERICA

 7        Plaintiff,

 8   Vs.

 9   FRANK RUSSELL MCCOY

10        Defendant.

11

12                       MOTION HEARING

13          BEFORE THE HONORABLE W. LOUIS SANDS
              UNITED STATES DISTRICT COURT JUDGE
14

15

16   DATE:                    JANUARY 7, 2010

17   LOCATION:                ALBANY, GEORGIA

18   COURT REPORTER:          R. DARLENE PINO

19

20   APPEARANCES:

21        FOR THE PLAINTIFF:    JAMES N. CRANE
                                CHANTEL L. FEBUS
22

23   FOR THE DEFENDANT:         CYNTHIA W. ROSEBERRY

24


25
```

1        (Defendant not present)

2              THE COURT:  All right.  Good morning.

3              COUNSEL COLLECTIVELY:  Good morning.

4              THE COURT:  Thank you for your patience.  We had

5       a little bit of mix-up about the calendar this morning,

6       but we're all here.

7          The Court sat down for a hearing in the case of

8       United States versus Frank Russell McCoy in case number

9       1:07-CR-18(WLS).  There was a motion by the government to

10      permit 404(b) evidence, and I think because we may have

11      gotten off track a little bit in the scheduling of

12      responses and all and we've got that back in line, the

13      defense filed its ultimate response.  I think the

14      government has since filed a reply, and I thought we

15      should probably discuss this in the form of a hearing to

16      see -- so we could get this resolved so everyone would

17      know where we stand with regard to that motion.

18         I think maybe just a brief summary from the

19      government and any other, further argument from the

20      defendant is all I need to hear really.  All right.

21             MS. FEBUS:  Morning, Your Honor.

22             THE COURT:  Good morning.

23             MS. FEBUS:  Just in brief summary, it's the

24      government's position that the child pornography evidence

25      that was found on the defendant's computer may be

 1    admissible if the defendant -- the defense through its

 2    witnesses, or the defendant taking the stand himself,

 3    opens the door to that issue.

 4         THE COURT:  I think the only question I had

 5    about opening the door, I know that's a theory that's been

 6    with us a long time, you know.  That usually falls with

 7    regard to a defendant taking a very broad statement of

 8    innocence and lack of any responsibility, and that

 9    generally means that you can ask about anything.

10         Does the government have any suggestion as to what it

11    thinks is an open-door sort of statement?

12         MS. FEBUS:  Yes.  I think that probably the most

13    obvious one, the one that's most likely to come up, is if

14    the defendant himself or the defense expert takes the

15    stand and argues probably one of two things or both.  If

16    it is argued that the defendant's stories, the ones that

17    were found on his computer and uploaded to the Internet,

18    are not prurient, that they're not directed to a morbid

19    sexual interest, or if someone gets on the stand for the

20    defendant and testifies regarding his intent with respect

21    to the uploading of those images to the Internet, I think

22    in that case, that type of testimony is allowed, some of

23    which would not be legally relevant, so we would object,

24    but if it's allowed, I think the government should be able

25    to introduce the 404(b) evidence because these stories are

1    found on the computer and then also all of these, you

2    know, 10,000 images including a streaming screensaver were

3    also found on the computer.  To really understand the

4    context of a story, the background to why the defendant

5    wrote them, the government thinks that it would be

6    appropriate to introduce those images.

7         So that's one way that it could come in, and the

8    government's argument there would be that the introduction

9    of the images would be inextricably intertwined with the

10   defendant's stories in large part because the stories,

11   which the defendant has assigned authorship dates,

12   correspond to some of the images and that the stories

13   describe some of the images.  So to the extent that the

14   defendant's intent or the sexual nature of the interest --

15   I'm sorry -- of the stories or whether the stories appeal

16   to prurient interests become an issue, the government

17   thinks that it should be able to introduce the child

18   pornography images in that case.

19        THE COURT:  Would it be a fair description of

20   the government's position to say that the government is

21   not asserting this as being evidence that should be

22   introduced in the main --

23        MS. FEBUS:  That's absolutely right.

24        THE COURT:  -- because, I guess, the nature of

25   this charge is what I think this Court tried to make clear

1    in the last order, this is an obscenity prosecution

2    although it may, as a subject matter, relate somehow to

3    children or matters of that nature is essentially an

4    obscenity case --

5              MS. FEBUS:  Yes.

6              THE COURT:  -- and I think there may be even a

7    more narrowing of the -- of the evidence in the case in

8    light of -- I think there -- I don't know whether that

9    will be redone at the trial itself, but I think there's

10   been some suggestion that there's no denial by the

11   defendant that those were his writings or that the up-link

12   was from him, but he has a legal argument that this does

13   not constitute a violation of the law, either as the law

14   states it or that it cannot be under the Constitution.

15             MS. FEBUS:  I agree with that in part.  That

16   brings up the defendant's stipulation.  So the defendant

17   stipulated that he authored the stories, but as far as the

18   government knows, the defendant has not stipulated to the

19   uploading of the stories to the Internet.

20             THE COURT:  That's what I'm saying.  I don't

21   know that I've said that accurately, but essentially this

22   case is about whether the contents of this, whether or not

23   there's legal nexus --

24             MS. FEBUS:  Yes.

25             THE COURT:  -- that he could be -- that he could

1    be criminally accountable for.

2                MS. FEBUS:  Exactly.  Exactly.  Which is why

3    it's the government's --

4                THE COURT:  Right.

5                MS. FEBUS:  -- position that we would only try

6    to introduce this as inextricably intertwined depending on

7    what the defendant puts on for his defense and arguments.

8         So that's one way we think it could come in.

9         In addition to that, it could come in -- And this is

10   actually related to what we were just discussing as 404(b)

11   as other act evidence, again, because the defendant has

12   only stipulated to authoring the stories and the

13   authorship of the stories is not the crime.  The crime is

14   causing -- using and causing to be used interactive

15   computer service as the transport obscene material.  So

16   that the defendant wrote the stories is something that we

17   are going to introduce and prove because it's inextricably

18   intertwined with this uploading the stories, but in order

19   to make the 404(b) other act evidence issue go away, the

20   defendant would essentially have to stipulate to uploading

21   the stories to the Internet, and the defendant hasn't done

22   that.

23        And so that may become an issue.  And if that's the

24   case, then there are several things that the government

25   would want to introduce with respect to the child

1    pornography images.  This is also what we would seek to

2    introduce if the defendant proposes some type of alibi

3    defense.  Normally in child exploitation cases when we're

4    dealing with computers one of the things that we have to

5    prove is that it's the defendant who did the uploading and

6    the defendant who did the criminal activity.  One of the

7    ways that we do that is by looking at other instances of

8    activity on the computer, whether it's accessing a bank

9    account or sending an e-mail, other activity that

10   identifies the defendant as a user of the computer and as

11   the person who used the computer close in time to the

12   criminal activity.  And, again, some of the facts that I

13   just stated with regards to the downloading of the CP

14   images and those file creation dates and the dates that

15   the defendant himself assigned to stories on his Web site,

16   some of that information or that evidence, rather, might

17   become relevant to prove the identity of the defendant as

18   the person who committed the criminal acts that are at

19   issue.

20        And so that would be our argument under 404(b).

21            THE COURT:  How would that identify him as the

22   person?

23            MS. FEBUS:  Because it's the way that we prove

24   who used the computer, when the computer was used, and

25   what the computer was used for.  And so if there is -- So,

1    for instance, if the defendant argues I didn't upload

2    those stories, my son did, then one of the things that we

3    would try to prove is that -- an upload date, you know,

4    just a date, random date, January 1st, 2007, was close in

5    time to when the defendant was engaged in other

6    activities.  And we --

7            THE COURT:  Yes, but that -- would you know --

8    how would you know whose activity that was?  I mean, I'm

9    not trying to get ahead in the case, but I mean --

10           MS. FEBUS:  That's how we prove it up.  We try

11   to show, you know, the defendant accessed the bank

12   account, you know, at 3 p.m. that day, and then there was

13   an upload, you know, two hours later.

14           THE COURT:  By showing something --

15           MS. FEBUS:  And the inference that's drawn from

16   the closeness of that activity.

17           THE COURT:  That still is something that you

18   think is identifiable with the defendant?

19           MS. FEBUS:  Yes.  Yes.

20       So that, again, depending on what the defendant

21   proffers and his defense might be another issue.

22       Then the third way that we think that this evidence

23   might come in is if the defendant himself takes the stand.

24   And if the defendant takes the stand, the government would

25   be able under Rule 608 and Rule 613 to question the

**R. Darlene Pino**
**United States Court Reporter**
**(229) 343-7550**

1    defendant about his suitability or character for

2    truthfulness as a witness and also to get into questions

3    of prior inconsistent statements.  And that all relates

4    back to the conversation that the defendant had with a

5    Minnesota Sheriff's Deputy Charles Ankney, who we plan to

6    have come in and testify.  And during that conversation

7    the defendant offered up information regarding whether he

8    had child pornography in his possession in his home, and

9    he answered that question or his response to the Deputy

10   was that he did not possess child pornography.  It's the

11   government's position if the defendant takes the stand,

12   the government should be able to question him about his

13   trustworthiness in that regard and then question him to

14   see if he's going to make an inconsistent statement, one

15   inconsistent to his prior statement to Deputy Ankney.

16            THE COURT:  I mean, I lost you there on that

17   one, frankly speaking.

18            MS. FEBUS:  Okay.

19            THE COURT:  I mean, his character for

20   truthfulness, that's usually reputation or based on some

21   prior finding of untruthfulness as opposed to what the

22   truthfulness was within the context of a given case.

23   That's where I where I kind of lost you.

24            MS. FEBUS:  We think that this -- And we agree,

25   but we think this would be in the context of the given

1    case because the incident between Deputy Ankney and Mr.

2    McCoy occurred in this general investigation where Deputy

3    Ankney responded to a civil stand-by call from Mr. McCoy's

4    wife, and she was reporting the defendant's stories.  She

5    called the police because she wanted to alert them to what

6    she considered to be improper or criminal activity with

7    respect to the stories.

8          THE COURT:  So are you saying then there's a --

9    the suggestion is that he was asked a specific question,

10   he gave an answer, and that later, in the government's

11   position, proved to be untrue?

12         MS. FEBUS:  Yes.  Exactly.

13         THE COURT:  All right.

14         MS. FEBUS:  And so those would be the way,

15   again, if the defendant opens the door that the government

16   thinks that we would be able to introduce that evidence.

17         THE COURT:  All right.

18         MS. FEBUS:  Thank you.

19         THE COURT:  Thank you.  Ms. Roseberry.

20         MS. ROSEBERRY:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MS. ROSEBERRY:  I guess first I would say that

23   we generally don't disagree with the proposition that if

24   there were some prior inconsistent statement that the

25   government should have an opportunity to test that prior

1    inconsistent statement.  I'm not so sure that having items

2    that were not seized as a result of that statement -- In

3    other words, this conversation with this Deputy Ankney did

4    not result in any seizure at that time of anything, and

5    wasn't at that moment a part of this investigation.  I

6    think it later became a part of the investigation.  But we

7    would concede that if anyone takes the stand, you can

8    certainly test any prior inconsistent statement under 608

9    and 613, so I don't think we're quibbling about that.

10        I think the issue that we have is -- I'm a little bit

11   confused, I have to be frank with you, about the idea that

12   something can be inextricably intertwined and yet not be

13   relevant until it's triggered by something else.  I'm sure

14   the government would say that these stories are patently

15   offensive, it's part of their burden of proof.  And with

16   that, when you think about admitting evidence like this,

17   the balance goes to 403 or is made pursuant to 403, and we

18   know from cases that the government cited like King in its

19   response to our Motion in Limine that if the prosecution

20   doesn't need it, then it doesn't come in that way.  In

21   other words, the lesser the need for it, the more likely

22   it is that the Court should exclude it under this idea

23   that it's just too prejudicial, that the prejudice

24   outweighs any probative value it has at all, that it would

25   be, in the words of the case cited by the government, a

1    matter of scant and cumulative probative force and not

2    something that the Court should deem has enough weight to

3    outweigh -- substantially outweigh the prejudice that it

4    would have.

5         So we would offer that it's not inextricably

6    intertwined because as part of the government's case we

7    expect for them to say, look at these stories, you can

8    look at them and see that they're patently offensive, you

9    can look at them and see that they appeal to prurient

10   interest.  And so in light of King, we would say that they

11   shouldn't be allowed under any circumstances in a 403 sort

12   of evaluation and they certainly don't come in, in the

13   government's case in chief, and I think they've conceded

14   that that's the issue, that they only come in if the

15   defendant takes the stand.  We believe that some question

16   about the inconsistency would be the extent to which the

17   government could test that veracity rather than some

18   further extrinsic physical evidence with respect to the

19   veracity of those statements.

20        The idea that -- It sounds like the government is

21   trying to limit our challenge to its burden of proof of

22   one of the elements, prurient interest, by saying that if

23   we attack their ability to prove that element then we've

24   somehow opened the door to this extrinsic evidence to come

25   in to show that these stories, which the government will

1    say is patently offensive, appeal to the prurient

2    interest, and that just seems like sort of a backwards

3    sort of -- a backdoor kind of argument.  It almost seems

4    like using a crutch to get something in that --

5             THE COURT:  I forgot to ask the government this

6    question because when we're speaking of obscenity or its

7    prurient interest -- prurient interest only in that

8    material, we're talking about the material that's before

9    the Court --

10            MS. ROSEBERRY:  That's exactly right, Your

11   Honor.

12            THE COURT:  -- not -- not -- You're really not

13   talking about the defendant's view of it.

14            MS. ROSEBERRY:  That's right.  That's right.

15   You're talking about --

16            THE COURT:  But whether he perceives it as

17   prurient or not, there are probably things that some

18   people would never see prurient no matter how shocking it

19   was and there are others that would see the slightest

20   thing --

21            MS. ROSEBERRY:  That's right.

22            THE COURT:  -- as shocking, and that's where the

23   community standards, I guess, come in.  But I'll give

24   counsel an opportunity to respond on that, but that was a

25   question I had intended to ask about.

1          MS. ROSEBERRY:  As a matter of law -- as matter

2     of fact, Your Honor, I believe that the case law would say

3     that his intent wouldn't matter in this case.  Even if he

4     had the best of intentions, it wouldn't matter.  So to try

5     to use these photos to prove his intent would be a legal

6     misnomer, it's not something that's a part of the

7     government's burden of proof as we see it.  I think the

8     case law is pretty clear that as long as he knew that it

9     was sexual in nature, that that's the general intent that

10    the government would have to prove.

11         THE COURT:  The one question I have though that

12    counsel mentioned by being inextricably intertwined was if

13    there's an issue as to who authored and who placed these

14    things at any place where it was placed, if it was, is not

15    a matter that could be directly proved say by an admission

16    or otherwise, then the fact of these other matters might

17    in some way be relevant to proving that.  In other words,

18    if you're proving what's going on on the Internet from

19    this particular source, you know, then what other things

20    may have been done that otherwise may be irrelevant might

21    be relevant for that purpose.

22         MS. ROSEBERRY:  Well, Your Honor, I guess I

23    would first say I'm not sure that's going to be an issue

24    at trial, although I wouldn't want to misstate our

25    position here based on what happens during the

1    government's case in chief.  But I would put that there --

2    if the government were so inclined that it could have

3    found some less opprobrious evidence, for example, some

4    bank account as the government mentioned or something like

5    that, if it is relevant, to show perhaps that Mr. McCoy

6    was somehow associated with that computer at a particular

7    time, but even at that -- I mean, you can show that

8    someone with that computer name was signed on at a

9    particular time, but you cannot show that -- who was the

10   person who was using that particular computer name at that

11   time, and the best example is that Agent McCoy posed as --

12   pardon me -- Agent Brant posed as someone else as he was

13   behind the computer sending these requests out.  I mean,

14   we just don't know who's behind there.

15       So perhaps, tangentially, it would be relevant, you

16   know, there could be some inferences drawn.  But the

17   government surely could have found something that wasn't

18   as prejudicial to do that with in that it seized his

19   entire computer.

20           THE COURT:  Okay.  All right.  The government is

21   the movant, and also that question I asked that I did not

22   ask while you were there, I'll give you some opportunity

23   to maybe comment on that, too.

24           MS. FEBUS:  The government agrees with the

25   Court's statement of the law with respect to the obscenity

1   charge, and that is, that the finding has to be an average

2   person applying contemporary community standards to find

3   the material to be --

4           COURT REPORTER:  Could you speak just a little

5   slower, please?

6           MS. FEBUS:  I'm sorry.

7       That the finding would have to be that an average

8   person applying contemporary community standards would

9   find that the material taken as a whole appealed to the

10  prurient interest, and we completely agree with that.

11      But as part of the 1462 violation, one of the things,

12  as defense counsel mentioned, that we have to prove up is

13  that the defendant knew at the time of transportation that

14  the materials were sexually oriented, and it is the

15  government's position that having to prove up the sexual

16  orientation and having to prove up the prurient interest

17  with respect to the average person of the community might

18  legitimately bring into evidence other items that were on

19  the computer that might be indicative of the context of

20  the stories themselves again because there are stories

21  that describe -- in the government's view that describe

22  images that were also found on the computer.  But one of

23  the things that I believe that I mentioned earlier and

24  I'll mention again is that, you know, the government would

25  prefer that the Court reserve its ruling on all of this

 1    because none of this can be fleshed out --

 2            THE COURT:  Yeah, I think you're exactly right

 3    --

 4            MS. FEBUS:  -- until we have testimony.  So, you

 5    know, it's great to, you know, get all of this out in the

 6    open so that we know what our relative positions are, but

 7    we can only, you know, posture or say what we think is

 8    going to --

 9            THE COURT:  You anticipated the Court's ruling,

10    and that's not unusual about this case, I mean, because

11    I've found in my experience that it is very difficult to

12    correctly call a 404(b) issue outside of the specific

13    context that it's presented.  It's so fact specific and

14    circumstance specific, so I seldom, unless it's something

15    that's clearly admissible or clearly not, so make those

16    rulings, but most fall within that context.  So what I

17    would do is I will reserve a ruling on it, but with this

18    proviso that that particular will not be presented to the

19    Court as a part of the evidence without notice of the

20    Court at the time.  In other words, if you reach that

21    point in the case that you felt like, Judge, this is where

22    we think this evidence can now be introduced, that's where

23    we'll stop it and take up that issue at that time and then

24    we'll -- the context should have been fully in place by

25    that time and the Court will be able to rule.

```
 1               MS. ROSEBERRY:  Your Honor --

 2               THE COURT:  Ms. Roseberry.

 3               MS. ROSEBERRY:  -- may I inquire of the Court?

 4     Are you speaking with respect to the government's case in

 5     chief or --

 6               THE COURT:  The 404(b).  The government has

 7     already indicated that it was not intending to raise that

 8     in its case in chief.  It would be in rebuttal or some

 9     other ways.

10               MS. ROSEBERRY:  Okay.

11               THE COURT:  But in any case so that we -- so

12     there's no unintentional or putting it up.  I think also

13     it's a lot easier because there's no jury here.  So that

14     idea of the jury hearing it so I don't worry about it, but

15     that it not be actually gone into without notice to the

16     Court from the government, Your Honor, we believe this is

17     the point in time that we can now submit or elicit the

18     evidence that's subject to the motion.  Of course, at that

19     time, the defense will have an opportunity to make any

20     statement that it wished with regard to whether it

21     believed that -- anything is different than what we now

22     know.

23          All right.

24               MS. ROSEBERRY:  Thank you, Your Honor.

25               THE COURT:  Now, were there any other motions
```

1    that we had?  I think pretty much everything else I think

2    the Court has issued something.

3         MS. ROSEBERRY:  I believe we do have a couple of

4    other matters though --

5         THE COURT:  Okay.

6         MS. ROSEBERRY:  -- to address.

7         THE COURT:  Let me hear those.

8         MS. ROSEBERRY:  Your Honor, I was wondering --

9    I've spoken with the government about this.  I understand

10   that our bench memoranda are due today, and this hearing

11   will take four hours and travel time alone out of my

12   ability to work on that.  I was wondering if you would

13   allow us until tomorrow.

14        THE COURT:  Yeah.  That will be fine.

15        MS. ROSEBERRY:  Okay.

16        THE COURT:  That will be fine.  I just think

17   that's helpful for the Court so that we are focused and

18   not -- it will help me listen better.

19        MS. ROSEBERRY:  Yes, sir.  We're absolutely

20   willing to do that.  I think the government has one

21   matter.

22        THE COURT:  Mr. Crane.

23        MS. ROSEBERRY:  Oh, let me just say this.  Thank

24   you, Mr. Crane.  Your Honor, it's my understanding that

25   you issued an order, and we're grateful for that order,

1    for subsistence in housing for our client.

2              THE COURT:  Yes.

3         MS. ROSEBERRY:  As I stand here, I don't believe

4    travel arrangements have been made.  We have followed up

5    with the Marshals to try to get that done, and I'm

6    concerned now about the weather coming from Minnesota at

7    this point.  I don't know if they're going to try to put

8    him on a bus or put him on an airplane.  I suspect that if

9    he is put on a bus, it will take about 24 hours.  He's

10   60-something years old.  I think it will take him about 24

11   hours to get here if the weather is not inclement, and we

12   know there's inclement weather coming.  And, of course, we

13   need to be able to spend some time with him prior to

14   trial.

15        And I just bring this up because --

16             THE COURT:  That's why the Court directed that

17   that be by Friday because I knew that that was the case.

18        Ms. King, after court, would you check with our local

19   Marshal and see what they can find out about what's going

20   on with those arrangements.

21        We do have some flexibility since it's a bench trial,

22   and the only other case that would need a trial is for the

23   following week, so if I need to push it back a little bit

24   --

25             MS. ROSEBERRY:  Yes, sir.

1           THE COURT:  -- I could.  And we'll know that
2       after we hear from them to see what they're -- so they may
3       be flying him out.  Because even that, who knows.
4           MS. ROSEBERRY:  And then I imagine that he's --
5       we'll try to house him here in Albany, which would mean
6       our, you know, shifting down here a few days early,
7       perhaps over the weekend I guess.
8           THE COURT:  I issued an amended order --
9           MS. ROSEBERRY:  Yes, sir.  Thank you for that.
10          THE COURT:  -- yesterday because we found that
11      there's some dark places in law yet in terms of trying to
12      figure out just how to do these things.  But I think we
13      got it figured out.  But I think there may be some
14      practical problem that you raise --
15          MS. ROSEBERRY:  Yes, sir.
16          THE COURT:  -- that may have a greater effect,
17      but we do have the ability to shift back, we can push
18      back, you know, a day or two if we have to.
19          MS. ROSEBERRY:  Thank you, Your Honor.
20          THE COURT:  Do you all still think this case is
21      going to take two or three days?
22          MS. ROSEBERRY:  Yes, sir.
23          THE COURT:  Okay.  Remember it's a bench trial,
24      so we shouldn't have to, you know --
25          MS. ROSEBERRY:  With a --

1          THE COURT:  The questions are going to be a lot

2     tighter.

3          MS. ROSEBERRY:  I'll just say I have a caveat

4     because I have a need for nervous bathroom breaks

5     frequently, so that may delay it a little bit.

6          THE COURT:  Well, we have a kind of standing

7     rule that, you know, if anybody really has to have a

8     recess, we'll take one.

9          MS. ROSEBERRY:  Thank you.

10          THE COURT:  I intend to also keep the usual kind

11     of tight -- the morning schedule because I think it still

12     gives the Court the ability to keep up with other matters

13     that we don't want to get behind in, so I was thinking the

14     8 to 2.  We may push it back a little bit, like 8:30 or

15     something like that and go until 2:30 or something like

16     that.  But the Court intends to keep that schedule.

17          MR. CRANE:  If I can just address the Court on

18     one issue briefly.  Your Honor, we have filed two

19     affidavits from custodians of records from two Internet

20     providers.  One is called Earthlink, one was originally

21     called Everyone's Internet, but is now owned by a parent

22     company called The Planet.  These are custodians of

23     records.  The underlying documents were provided in

24     discovery a long time ago, well over a year ago.  The

25     custodian will simply repeat the standard business record

1    foundation questions, that these are records that were

2    made at or about the time of the underlying transaction,

3    kept in the ordinary course.

4         And we had filed our notice before Christmas of

5    intent to rely on affidavit, but with the holidays, it

6    took us a while.  They are now on file.  And it allows the

7    government, then, to release the witness from subpoena.

8    Thus far the defense has not objected formally, although

9    Ms. Roseberry has said she would like more time to decide

10   that issue.  If that issue could be resolved, then the

11   Internet connectivity with a certain address can be

12   resolved by records, and it's helpful, I believe, to the

13   government and to the parties, and if that can be resolved

14   --

15        THE COURT:  These are certified documents?  Once

16   they're acknowledged by the custodian --

17        MR. CRANE:  Yes.

18        THE COURT:  -- would be self-authenticating

19   unless there's an objection?

20        MR. CRANE:  Yes.  Unless they're under 90211.

21   We are, of course, allowed to proceed that way unless

22   there is a genuine issue as to the authenticity of the

23   documents raised by the defense that they are somehow

24   forgeries, not authenticate, not what they purport to be.

25        THE COURT:  All right.  Ms. Roseberry, can you

1    give us an answer on that or have an idea when you can

2    because, obviously, if we don't need to fly someone in --

3              MS. ROSEBERRY:  Absolutely, Your Honor.

4              THE COURT:  -- under this weather, we shouldn't.

5    And when that, I mean the parties.

6              MS. ROSEBERRY:  Let me assure you we have every

7    desire to try to, you know, not be obstructive in that

8    way.  It's just that I need to be able to have a

9    meaningful conversation with my client.  Of course, the

10   Sixth Amendment right to confrontation, you know, comes up

11   in there, and I need to have a meaningful discussion with

12   him to be able to do that, and I've just not had an

13   opportunity to do that.  I expect to do that.

14             THE COURT:  Let me see that.

15        (Discussion off record between counsel)

16             MS. ROSEBERRY:  Your Honor, Mr. Crane has

17   indicated that if we can speak with our client and let him

18   know tomorrow that that would accommodate them, and I'm

19   certainly, you know, willing to try to do that and speak

20   with my client.

21             THE COURT:  All right.  Because, I guess, you

22   are in contact with him --

23             MS. ROSEBERRY:  Yes.

24             THE COURT:  -- though not -- by phone but not --

25   although it's not face-to-face?

```
 1            MS. ROSEBERRY:  That's right, Your Honor.  And
 2   he's elderly, so it just -- it takes a little while to
 3   explain things to him.
 4            THE COURT:  All right.
 5            MS. ROSEBERRY:  Not elderly, but.
 6            THE COURT:  Yeah.
 7            MS. ROSEBERRY:  I have to pull that back.
 8        (Laughter)
 9            THE COURT:  How old did you say he was?
10            MS. ROSEBERRY:  I didn't want to step on any
11   toes.
12        (Laughter)
13            THE COURT:  Just how old did you say he was?
14            MS. ROSEBERRY:  I think he's 200, Your Honor,
15   200.
16            THE COURT:  If I remember correctly, and I will
17   remember it the way I remember it, I'm not that old.
18        Okay.  Is there anything else?
19            MR. CRANE:  Yes.  There was one other issue,
20   and, Your Honor, we'll put this in our bench memo, which
21   we'll file today, and I've already mentioned it today to
22   Ms. Roseberry.  There's a great number of stories that the
23   defendant wrote, and it may be as many as 4,000 pages,
24   although a lot of them are very similar and it becomes
25   almost mind-numbingly impossible to determine exactly if
```

1    one is repeating itself.  What we proposed is the -- what

2    we would propose to the Court is the following.  There

3    were 18 stories that were downloaded within the time

4    period of the indictment initially to Michael O'Keefe's

5    computer back in -- I don't have the exact date, but

6    within the time frame of the indictment, and the Court is

7    generally familiar with these.  There are other downloads

8    that were made by Special Agent Cory Brant on two other

9    occasions that include 3,000 pages and then one I believe

10   is about 4500 pages, that cannot be conveniently examined

11   on a case-by-case basis by, I would submit, any finder of

12   fact, whether jury or the Court.  Therefore, what we

13   propose is that the 18 stories are a representative sample

14   of his writings, which the government contends are all

15   obscene, and would ask for a special verdict as to the 18

16   but we intend to tender all of them into evidence for

17   context.

18        And I believe that the defense may object to that,

19   but that is what we submit is a workable proposal, and

20   then have a special verdict form as to each of the 18

21   stories.

22        THE COURT:  Well --

23        MS. ROSEBERRY:  I don't know if you want me to

24   address that now or in our bench memo.

25        THE COURT:  I think you can just respond to that

 1    then.  Since it's mentioned in their brief, I'll let you

 2    include that in your response.

 3            MS. ROSEBERRY:  Yes, sir.  We will.

 4            THE COURT:  Anything else?

 5         (No audible response)

 6            THE COURT:  Okay.

 7            MR. CRANE:  That's all from the government.

 8            THE COURT:  All right.  Well, thank you all very

 9    much.  I'll just do a brief order stating what I just

10    stated on the record earlier that that will be -- the

11    Court will reserve ruling and that you all are bound not

12    to inquire into those matters on the record until such

13    time as there's been notice and a specific order on the

14    ruling by the Court allowing it.  Okay.

15        If anything else needs to be done with regard to the

16    witness we discussed after tomorrow, let me know.  And

17    also when we find out something from the Marshals or if

18    you find out something, Ms. Roseberry, that may affect his

19    arrival here because I think this weather is supposed to

20    be coming through today, tonight, and tomorrow, and I

21    think in the Midwest it's -- because he's in Minnesota,

22    right?

23            MS. ROSEBERRY:  Yes, sir.

24            THE COURT:  The only thing is that they are

25    equipped and more -- feel more at home with that kind of

1    weather than maybe we do, so it may not be as restrictive

2    as we think it is to them.  But if it looks like that

3    there might be some delay that we need to set this off

4    from Monday, if you all will let me know or let Ms. King

5    know, and we can just push it to Tuesday.  I'd like to

6    keep it at Monday if we can, but we do have some

7    flexibility in the schedule.

8         All right.  Thank you all very much.  We'll be in

9    recess -- or adjourned.

10        (Court adjourned)

11

12                        **<u>CERTIFICATE</u>**

      I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
13    TRANSCRIPT OF THE PROCEEDINGS.

14

15
      /s/_____
16    R. DARLENE PINO                        NOVEMBER 15, 2013
      UNITED STATES COURT REPORTER
17    Certified Shorthand Reporter (Fl)
      CB King Federal Courthouse
18    201 West Broad Avenue
      Albany, Georgia 31701
19    Phone:(229)343-7550

20

21

22

23

24

25